# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| AMERICAN ASSOCIATION OF ANCILLARY BENEFITS, A FLORIDA NOT-FOR-PROFIT CORPORATION, and PREMIER HEALTH SOLUTIONS, LLC, A TEXAS LIMITED LIABILITY COMPANY, | § § § § § § | Case No. 24-CV-783 |
| | § | Judge Sean D. Jordan |
| *Plaintiffs,* | § § | |
| v. | § § | |
| XAVIER BECERRA, in his official capacity, as SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, JULIE A. SU, in her official capacity, as acting UNITED STATES SECRETARY OF LABOR, and JANET YELLEN, in her official capacity, as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE TREASURY, | § § § § § § § § § § § § | |
| *Defendants.* | § § | |

## *CORRECTED*
## PLAINTIFFS AMERICAN ASSOCIATION OF ANCILLARY BENEFITS AND PREMIER HEALTH SOLUTIONS, LLC'S MOTION FOR SUMMARY JUDGMENT

Lead Counsel for Plaintiffs
Gonzales Taplin PA
s/Dominick L. Lanzito
Alex Gonzales
Dominick L. Lanzito
Attorneys for Plaintiffs
Gonzales Taplin PA
P.O. Box 171267 Austin, Texas 78717
Tele:  (512) 492-5251 (for A. Gonzales)
        (312)724-8035 (for D. Lanzito)
Emails: agonzales@gonzalestaplin.com
dlanzito@pjmlaw.com

Local Counsel for Plaintiffs

THE FOWLER LAW FIRM, P.C.
/s/ Michael J. Smith
Michael J. Smith
Texas State Bar No.24037517
3301 Northland Drive, Suite 101
Austin, Texas 78731
Telephone: 512.441.1411
Facsimile: 512.469.2975
Email: msmith@thefowlerlawfirm.com

NOW COME Plaintiffs AMERICAN ASSOCIATION OF ANCILLARY BENEFITS and PREMIER HEALTH SOLUTIONS, LLC'S, by and through their counsel, and moves this Court for the entry of an Order granting summary judgment in their favor and against Defendants. In support hereof, Plaintiffs provide and incorporate by reference herein the following:

1.    Plaintiffs' Memorandum of Law in Support of Its Motion for Summary Judgment.

2.    Plaintiffs' Statement of Undisputed Facts incorporated into the Memorandum of Law, with supporting exhibits.

WHEREFORE, for the above and foregoing reasons, PLAINTIFFS AMERICAN ASSOCIATION OF ANCILLARY BENEFITS and PREMIER HEALTH SOLUTIONS, LLC'S, respectfully requests that this Honorable Court enter an Order granting this motion for summary judgment, award attorneys' fees and costs and for any further relief this Court deems fair and just.

Respectfully submitted:

By:    */s/ Dominick L. Lanzito*
Texas State Bar No.24037517
3301 Northland Drive, Suite 101
Austin, Texas 78731
Telephone: 512.441.1411
Facsimile: 512.469.2975
Email: msmith@thefowlerlawfirm.com

Lead Counsel for Plaintiffs
GONZALES TAPLIN PA
s/Dominick L. Lanzito
Alex Gonzales
Dominick L. Lanzito
*Attorneys for the AMERICAN*
*ASSOCIATION OF ANCILLARY*
*BENEFITS,*
P.O. Box 171267
Austin, Texas 78717
Tele:    (512) 492-5251 (for A. Gonzales)
         (312)724-8035 (for D. Lanzito)
**Emails:** agonzales@gonzalestaplin.com
dlanzito@pjnlaw.com
Local Counsel for Plaintiffs
THE FOWLER LAW FIRM, P.C.
/s/ Michael J. Smith
Michael J. Smith

## CERTIFICATION OF CONFERENCE

I, Dominick L. Lanzito, one of the attorneys for Plaintiff, conferred telephonically with one of the attorneys for Defendants, U.S. Department of Justice Attorney, Kyla Snow, as required by Local Rule CV-7(h), regarding the **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** and **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT.** Following that conference, the attorneys of record submitted a Joint Status Report (Doc. No. 29), which set out the briefing schedule for the afore-mentioned motions. The Court then set a briefing schedule for the cross-motions for summary judgment. (Doc. No. 30).

Dated: **November 12, 2024**

Respectfully submitted,

By:     s/Dominick L. Lanzito
        Dominick L. Lanzito

Gonzales Taplin PA
s/Dominick L. Lanzito
Alex Gonzales
Texas State Bar No. 08118563
Dominick L. Lanzito
Illinois State Bar No. 6277856
Attorneys for the AMERICAN ASSOCIATION OF ANCILLARY BENEFITS,
Gonzales Taplin PA
P.O. Box 171267
Austin, Texas 78717
Tele:   (512) 492-5251 (for A. Gonzales)
Tele:   (312)724-8035 (for D. Lanzito)
agonzales@gonzalestaplin.com
dlanzito@pjmlaw.com


Local Counsel for Plaintiff

THE FOWLER LAW FIRM, P.C.
/s/ Michael J. Smith
Michael J. Smith
Texas State Bar No.24037517
3301 Northland Drive, Suite 101
Austin, Texas 78731
Telephone: 512.441.1411
Facsimile: 512.469.2975
Email: msmith@thefowlerlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that, on November 12, 2024, I caused the foregoing documents to be filed with the Clerk for the Eastern District of Texas through the ECF system. Participants in the case who are not registered ECF users will be served through email.

Dated:  **November 12, 2024**

Respectfully submitted,

s/Dominick L. Lanzito

Gonzales Taplin PA
s/Dominick L. Lanzito
Alex Gonzales
Texas State Bar No. 08118563
Dominick L. Lanzito
Illinois State Bar No. 6277856
Attorneys for the AMERICAN ASSOCIATION OF ANCILLARY BENEFITS,
Gonzales Taplin PA
P.O. Box 171267
Austin, Texas 78717
Tele:    (512) 492-5251 (for A. Gonzales)
Tele:    (312)724-8035 (for D. Lanzito)
agonzales@gonzalestaplin.com
dlanzito@pjmlaw.com

Local Counsel for Plaintiff

THE FOWLER LAW FIRM, P.C.
/s/ Michael J. Smith
Michael J. Smith
Texas State Bar No.24037517
3301 Northland Drive, Suite 101
Austin, Texas 78731
Telephone: 512.441.1411
Facsimile: 512.469.2975
Email: msmith@thefowlerlawfirm.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| AMERICAN ASSOCIATION OF ANCILLARY BENEFITS, A FLORIDA NOT-FOR-PROFIT CORPORATION, and PREMIER HEALTH SOLUTIONS, LLC, A TEXAS LIMITED LIABILITY COMPANY, | § § § § § § § § | Case No. 24-CV-783 Judge Sean D. Jordan |
| *Plaintiffs,* | § § § | |
| v. | § § | |
| XAVIER BECERRA, in his official capacity, as SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, JULIE A. SU, in her official capacity, as acting UNITED STATES SECRETARY OF LABOR, and JANET YELLEN, in her official capacity, as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE TREASURY, | § § § § § § § § § § § § | |
| *Defendants.* | § § | |

<u>**CORRECTED**</u>
**PLAINTIFFS AMERICAN ASSOCIATION OF ANCILLARY BENEFITS AND
PREMIER HEALTH SOLUTIONS, LLC'S STATEMENT OF FACTS AND
MEMORANDUM OF LAW IN SUPPORT OF
<u>THEIR MOTION FOR SUMMARY JUDGMENT</u>**

Lead Counsel for Plaintiffs
Gonzales Taplin PA
<u>s/Dominick L. Lanzito</u>
Alex Gonzales
Dominick L. Lanzito
Attorneys for Plaintiffs
Gonzales Taplin PA
P.O. Box 171267 Austin, Texas 78717
Tele:  (512) 492-5251 (for A. Gonzales)
       (312)724-8035  (for D. Lanzito)
Emails: agonzales@gonzalestaplin.com
dlanzito@pjmlaw.com

Local Counsel for Plaintiffs
THE FOWLER LAW FIRM, P.C.
/s/ Michael J. Smith
Michael J. Smith
Texas State Bar No.24037517
3301 Northland Drive, Suite 101
Austin, Texas 78731
Telephone: 512.441.1411
Facsimile: 512.469.2975
Email: msmith@thefowlerlawfirm.com

i

# TABLE OF CONTENTS

Page

INTRODUCTION………………….…….……………………..…...…......……...1

STATEMENT OF THE ISSUES………...…….…….……………….…...………..1

STATEMENT OF UNDISPUTED MATERIAL FACTS…………..……………….2

STANDARD OF REVIEW………………………………………………………..11

ARGUMENT…………………………………………………………………..…11

    I.      Defendants' New Rule fails to satisfy APA Section 706 Review, as it is
unlawful, arbitrary and capricious and capable of repetition and regulatory
whiplash with election cycles……………………………….………...11

        a.    STLDI is an ambiguous phrase, and Defendants' tangential
interpretations are unlawful, arbitrary and capricious……………..12

            i.       The changes from the existing 2018 Rule do not meet the
tripartite test to surmount arbitrary and
capriciousness….....................................................................13

                  1.    Prohibiting "stacking" and flexibly setting changeable
terms is baseless under the statutory text and, thus,
unlawful…………………………………………...14

                  2.    The New Rule lacks a reasoned and nonconclusory
explanation for the sudden departure from the 2018
Rule……………………………………………….15

                  3.    Record-breaking ACA enrollment under the 2018 Rule
belies any requisite conscious belief that these changes are
better……………………………………………17

            ii.     The year-to-year and election-to-election uncertainty and
variability, further show arbitrary and capriciousness under §
706(2)(A)……………………..…………………………18

        b.    Defendants' attempt to divine Congressional delegation is contrary to
constitutional power under § 706(2)(B)—in violation of Article I and
II…………………………………………………………………20

            i.       Defining STLDI', where Congress did not, is the duty of the
Judiciary……………………………………………………21

c.   Should this Court impose § 706(a) vacatur and elect to not define STLDI the previously-upheld 2018 Rule that did not administratively legislate-away "stacking," would remain in place……………………………………………………………….…24

d.   Defendants' failure to comply with the Regulatory Flexibility Act § 706(2)(D-E)— without observance of RFA procedure and substantial evidence……………………………………….………25

e.   Defendants' New Rule infringes upon states' statutory reverse-preemption rights and authority under the McCarron Ferguson Act, violating § 706(2)(C)…………………………………..……..26

II.   This question of deep economic and political significance is one that Congress would have expressly assigned to Defendants—pursuant to the major questions doctrine……………………………………………27

CONCLUSION……………...…………...…………………………………..…..30

# **TABLE OF AUTHORITIES**

Page(s)

## **Cases**

*Allstates Refractory Contractors, LLC v. Su*,

    79 F.4th 755 (6th Cir. 2023)……………………………………………………14

*Alabama Ass'n of Realtors v. Dep't of H.H.S.*,

    594 U.S. 758
(2021)……………………………………………………………………28

*Association for Community Affiliated Plans v. United States Department of Treasury*,

    966 F.3d 782 (D.C. Cir. 2020)…….……………………..….……………..*passim*

*Biden v. Nebraska*,

    143 S. Ct. 2355 (2023)……………………………...……….…………….*passim*

*Biden v. Texas*,

    597 U.S. 785 (2022)……………...…………………………………………..11

*Big Time Vapes, Inc. v. F.D.A.*,

    963 F.3d 436 (5th Cir. 2020)………………………………………...…14, 19

*Braidwood Mgmt., Inc. v. Becerra*,

    104 F.4th 930 (5th Cir. 2024)……...…………………………………………11

*Corner Post, Inc. v. Bd. of Gov. of Fed. Reserve Sys.*,

    144 S. Ct. 2440 (2024)………………………………………..…11, 21, 24

*Davies Warehouse Co. v. Bowles*,

    321 U.S. 144 (1944)…………………………………………………………..27

*Decatur v. Paulding*,

    39 U.S. 497 (1840)……………………………………………………..22

*Encino Motorcars, LLC v. Navarro*,

    579 U.S. 211 (2016)…………………………………………………..*passim*

*FCC v. Fox Television Stations, Inc.*,

    556 U.S. 502 (2009)……………………………………………………12

*In re Amwest Sur. Ins. Co*.,

    245 F. Supp.2d 1038………………………………………………………26

*Kentucky Ass'n of Health Plans v. Miller*,

    538 U.S. 329 (2003)………………………………….……………….…..26

*King v. Burwell*,

    576 U.S. 473 (2015)……………………………….…………………*passim*

*Lamie v. U.S. Trustee.*,

    540 U.S. 526 (2004)………………………………….…………………22

*Loper Bright Enterprises v. Raimondo*,

    144 S. Ct. 2244………………………….……………….………………*passim*

*Marbury v. Madison*,

    5 U.S. 137 (1803)…………………………………………………………21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Insu. Co.*,

    463 U.S. 29 (1983)………………………………………………..….17

*Munich American Reinsurance Co. v. Crawford*,

    141 F.3d 585 (5th Cir. 1998)……………………………………….....26

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*,

    545 U.S. 967 (2005)…………………………………………….....17, 19

*Ojo v. Farmers Group*,

    600 F.3d 1205 (9th Cir. 2010)…………………………………………..27

*Riverview Health Institute LLC v. Medical Mutual of Ohio*,

    601 F.3d 505 (6th Cir. 2010)… ……………..………………….…………27

*Taggart v. Lorenzen,*

    587 U.S. 554 (2019)……………………………………………………………18

*U.S. v. Am. Trucking Ass'ns,*

    310 U.S. 534 (1940)…………………………………………………….………28

*U.S. v. Bodiford,*

    753 F.2d 380 (5th Cir. 1985)…………………………………………………16

*U.S. v. Dickson,*

    40 U.S. 141 (1841)………………………………………………………...22

*Utility Air Regulatory Group v. E.P.A.,*

    573 U.S. 302 (2014)…………………………………..………………….……..28

*Wayman v. Southard,*

    23 U.S. 1 (1825)……………………………………………………………...21

*West Virginia v. Environmental Protection Agency,*

    597 U.S. 697 (2022)………………………………………..……..12, 14, 29, 30

*Whitman v. Am. Trucking Associations,*

    531 U.S. 457 (2001)……………………………...……..………………..*passim*

*Wooden v. U.S.,*

    595 U.S. 360 (2022)……………………………………………………………12

## Constitutional Provisions

U.S. Const. Art. III. Sec. 2, Cl. 1………………………………………………………….20

## Statutes

5 U.S.C. § 706………………………………………..………………………...1, 11, 24

5 U.S.C. § 706(2)(A)-(E)……………………………………………………..,,*passim*

5 U.S.C. § 603(b)(3)………………………………………………………………..25

5 U.S.C. § 603(d)(1)(b)…………………………………………………………....25

42 U.S.C. § 300gg-91(b)(5)………………………………………………...2, 18

42 U.S.C. § 300gg………………………………….……………….……………1

XXV U.S.C.A. § 300gg-92……………………………………………………15

**Regulatory Materials**

Excepted Benefits; Lifetime and Annual Limits; and Short-Term, Limited-Duration Insurance, 81 Fed. Reg. 75,316, 73,318 (Oct. 31, 2016)………………………………3, 4

Interim Rules for Health Insurance Portability for Group Health Plans, 62 Fed. 16,894, 16,958 (Apr. 8, 1997)…………………………………………………………………3

Pub. L. No. 111-148, § 1551, 124 Stat. 119, 258 (2010)………………………...…3

*Short-Term, Limited-Duration Insurance*, 83 Fed. Reg. 7,437, 7,446 (Feb. 21, 2018)…………………………………………………………………………………...4

81 Fed. Reg. 75,316-19, 73,326 (Oct. 31, 2016)…………………………...…3, 4

83 Fed. Reg. 9837, 38212 at 38,243……………………………………………4

115 P.L. 97………………………………………………………………...……4

131 Stat. 2054……………………………………………...………………………4

2017 Enacted H.R. 1………………………………………………...……………4

115 Enacted H.R. 1………………………………………………...…….……4

**Secondary Sources**

§ 144:13. Generally, 10A Couch on Ins. § 144:13 …………………………...……23

The Random House Webster's College Dictionary (1st ed. 1996)………..…..18, 24

## INTRODUCTION

This novel case calls upon the duties of this Court to firmly establish the bounds of agency powers regarding Short-Term Limited-Duration Insurance plans ("STLDI"). It requires the Court to provide a concrete meaning of what it has meant since 1996 and whether the current definition violates the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Plaintiffs filed a four-count complaint alleging that: Defendants failed to satisfy the APA, violating the nondelegation doctrine (Count I), lacking statutory authority and violating the McCarran Ferguson Act (Count II), failed to muster substantial evidence (Count III), and that the New Rule was arbitrary and capricious (Count IV).

Without the Court's exercise of its duty to say what the law is, this major question of unconstitutional administrative exercise, left unbridled, will fluctuate with each election cycle. It leaves the matter uncertain for the public, insurance professionals who sell and service the plans, and the states, which were vested by Congress with regulatory powers over STLDI. But regardless of Defendants' terminology and tangential reasoning employed in their pursuit of broad agency rule-making authority and deference, their objectives were extinguished by *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). Congress did not authorize a perpetually shifting term limitation of STLDI, nor did it transfer legislative powers for the executive branch to prohibit consecutive renewals of policies—known as "stacking." Even if Defendants could show Congress wanted it, this Article III branch must consider whether the Constitution permits an Article II branch to exercise Article I powers in this ambiguous domain.

## STATEMENT OF THE ISSUES

I.   Whether Defendants' interpretation of the ambiguous term, "STLDI," and prohibiting "stacking" renewals is unlawful, arbitrary and capricious under APA §706(2)(A).

II.     Whether Defendants' attempts contravene the nondelegation doctrine and separation of powers—in violation of the U.S. Constitution's Article I and II—under APA §706(2)(B).

III.    Whether this Court should impose APA §706(a) vacatur and revert to the 2018 Rule, which set STLDI at thirty-six months and did not administratively legislate-away "stacking."

IV.     Whether Defendants failed to meet the requirements of the Regulatory Flexibility Act and §706(2)(D-E).

V.      Whether Defendants' New Rule infringes upon states' statutory reverse-preemption rights and authority under the McCarran Ferguson Act, in violation of §706(2)(C).

VI.     Whether this question of economic and political significance is one that Congress would have expressly assigned to Defendants—pursuant to the major questions doctrine.

## **STATEMENT OF UNDISPUTED MATERIAL FACTS**[1]

1.      In 1996, Congress, through the Health Care Portability and Accountability Act ("HIPAA"), amended the 1944 Public Health Service Act, exempting one particular type of insurance from most federal health insurance regulations. Congress called it "short-term limited duration insurance" ("STLDI") and exempted it from most regulations. *See* 42 U.S.C. § 300gg-91(b)(5).

2.      Through HIPAA, Congress enabled the Secretary to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of" subchapter XXV and to "promulgate any interim final rules as the Secretary determines are appropriate to carry out" subchapter XXV. 42 U.S.C § 300gg-92. The purpose of that subchapter was to prohibit discriminatory premium rates and limit the ability for rates to vary. 42 U.S.C.S. § 300gg.

3.      STLDI's purpose is understood to provide a tailored product for filling gaps in health insurance coverage without an enrollment period—such as for someone who left a job and needs temporary coverage until that person can obtain new employment, emerging adults who age-out of

---

[1] Plaintiffs have compiled the excerpted pages of the Record that support the Statement of Material Facts in Group Ex. 1 to this Motion; however, Plaintiffs reserve the right to incorporate anything contained within the administrative record, which are identified throughout as "R," followed by the corresponding Bates-stamped page numbers.

their parent's insurance at 26-years-old, retirees who are not yet Medicare-eligible, international travelers whose presence in the U.S. is brief and erratic, and those who exhaust coverage waiting periods—and provide an alternative to being uninsured. (Grp. Ex. 1, R 000065, 024347-48).

*1996-2016: "Within 12 months" interpretation, unchanged by Congress.*

4.      In 1997, the Departments of Treasury, Labor, and Health and Human Services stated that STLDI "means health insurance coverage provided pursuant to a contract with an issuer that has an expiration date specified in the contract (taking into account any extensions that may be elected by the policyholder without the issuer's consent) that is within 12 months of the date such contract becomes effective." (Ex. 2, Interim Rules for Health Insurance Portability for Group Health Plans, 62 Fed. Reg. 16,894, 16,958 (Apr. 8, 1997)).

5.      In 2004, the agencies reaffirmed that same definition in final rulemaking and used it until 2016. (Ex. 3, Final Regulations for Health Coverage Portability for Group Health Plans and Group Health Insurance Issuers Under HIPAA Titles I & IV, 69 Fed. Reg. 78,720, 78,748 (Dec. 30, 2004) ("within 12 months.")); (Grp. Ex. 1, R 023787).

6.      In 2010, Congress incorporated HIPAA's definition of "individual health insurance coverage," cross-referencing it over into the Affordable Care Act ("ACA"), excluding STLDI, and not referring to it directly. (Ex. 4, Pub. L. No. 111-148, § 1551, 124 Stat. 119, 258 (2010)); (Grp. Ex. 1, R 023946).

*2016-2017: three months, and prohibition of renewals was "not warranted" and too "difficult."*

7.      In 2016, the agencies decided that STLDI plans would have a term of "less than three months." (Ex. 5, Excepted Benefits; Lifetime and Annual Limits; and Short-Term, Limited-Duration Insurance, 81 Fed. Reg. 75,316-19, 73,326 (Oct. 31, 2016)).

8.      In 2016, STLDI accounted for 161,000 insureds and $146 million in STLDI earnings for issuers, but was believed to be higher than estimated because group coverage STLDI was not counted. (Grp. Ex. 1, R 024349).

9.      In 2016, Defendants acknowledged agency regulatory limitations against prohibiting stacking. (*See* Ex.5, Excepted Benefits; Lifetime and Annual Limits; and Short-Term, Limited-Duration Insurance, 81 Fed. Reg. 75,316, 73,318 (Oct. 31, 2016) (noting "in the Departments' view, such a restriction is not warranted," and "would be difficult for State regulators to enforce, since prior coverage of a consumer would have to be tracked.")).

10.     A year later, Congress enacted the 2017 Tax Cuts and Jobs Act ("TCJA"), removing all penalties previously imposed under the ACA. (*See* Ex. 6, 115 P.L. 97; 131 Stat. 2054; 2017 Enacted H.R. 1; 115 Enacted H.R. 1. ("Section 5000A(c) is amended…striking '2.5 percent' and inserting 'Zero percent', and (2) in paragraph (3)-- (A) by striking '$ 695' in subparagraph (A) and inserting '$ 0'")).

11.     A year after that, in 2018, the Departments of Health and Human Services, Labor, and the Treasury jointly proposed reverting to the historic STLDI plan term. (*See* Ex. 7, *Short-Term, Limited-Duration Insurance*, 83 Fed. Reg. 7,437, 7,446 (Feb. 21, 2018)).

12.     Following a comment period, the agencies' final 2018 Rule stated that STLDI "[h]as an expiration date specified in the contract that is less than 12 months after the original effective date of the contract," and the 2018 Rule added that "taking into account renewals or extensions, has a duration of no longer than 36 months in total." (Ex. 8, 83 Fed. Reg. 9837, 38212 at 38,243; (Grp. Ex. 1, R 024335)).

13.     In 2018, during a period of industry expansion 2.36 million consumers were enrolled in STLDI, 1.7 million of whom were enrolled through associations. (R 024047-49, 024466-68, 024479, 024493).

14.    Coordinated interviews occurred with state insurance regulators of Colorado, Florida, Idaho, Maine, Minnesota, Missouri, Texas, and Viginia—as part of evaluating and preparing for market-changes after the 2018 Rule. (Grp. Ex. 1, R 024359).

15.    By 2019, an estimated 3 million Americans were enrolled in STLDI, 2.2 million of whom enrolled in STLDI via associations, and the shift of 1.3 million was calculated to have resulted in $5.3 billion in welfare gains to those insureds. (Grp. Ex. 1, R 014643, 027042, 024466-68, 025845).

16.    Florida and Texas accounted for roughly one-third of enrollment, and other states included Arizona, Georgia, Illinois, Missouri, North Carolina, Ohio, Tennessee and Wisconsin. (Grp. Ex. 1, R 024468).

17.    In 2019, over 25 states allowed for STLDI plans with a duration of 11 months or longer (Grp. Ex. 1, R 024487).

18.    Between 2019 and 2021, there were seven separate unsuccessful bills between the U.S. House of Representatives and Senate, containing modifications to STLDI or seeking to invalidate the 2018 Rule, and one designed to eliminate STLDI altogether. (Grp. Ex. 9 – Proposed Legislation: H.R. 987, 116th Congress (2019); S. 1556, 116th Congress (2019), H.R. 1010, 116th Congress (2019), H.R. 1425, 116th Congress (2019); S. 352, 116th Congress (2021); S. 942, 116th Congress (2021); H.R. 1875, 117th Congress (2021)).

19.    In 2020, the U.S. House of Representatives Committee on Energy and Commerce found certain states had: wide-availability of STLDI, 24 states had banned or restricted STLDI-plans, other states declined to restrict STLDI, and the Committee recommended that if federal legislation was unsuccessful, restrictions should be recommended at a state-level and noted that overall STLDI enrollment was likely higher than analyzed (Grp. Ex. 1, R 024473, 024479, 024483, 024493).

20.     In 2020, the Congressional Budget Office estimated that annually to 2028, 1.5 million people would be enrolled in STLDI under the 2018 Rule—half of whom would otherwise have been uninsured and the other half enrolled in nongroup coverage (Grp. Ex. 1, R 023839-40, 025797).

21.     The Urban Institute estimated that 1.7 previously uninsured Americans gained insurance through STLDI's expansion. (Grp. Ex. 1, R 002031).

22.     Individual health insurance coverage grew "consistently since 2018," and in 2021, open enrollment saw a 36% increase, and from there, a 13% increase in 2022. (Grp. Ex. 1, R 000010).

23.     In 2023, a then-record of 16.4 million people enrolled in the exchange during the open enrollment period, 12.7 million of whom were new enrollees, and over 1.8 million more signed up later in 2023—and a study showed that non-ACA-regulated coverage dropped from 5.7 million to an all-time low of 1.2 million. (Grp. Ex. 1, R 000010, 022411).

24.     In 2024, the Centers for Medicare & Medicaid Services ("CMS") reported that a new record—21.3 million people enrolled in the ACA individual health insurance Exchanges, 5 million of whom were new (24% of total enrollments), and an additional 5 million enrolled during the 2024 open enrollment period. (Grp. Ex. 1, R 023794, 023847).

25.     In 2024, the Defendant Agencies promulgated 89 Fed. Reg. 23338 (Apr. 3, 2024), "New Rule," changing the 2018 Rule, such that STLDI now meant "health insurance coverage provided pursuant to a policy, certificate, or contract of insurance with an issuer that: (i) Has an expiration date…no more than 3 months after the original effective date" and "taking into account any renewals or extensions" could have "a duration no longer than 4 months in total," and requiring certain displays and notices in the accompanying policy materials. (Grp. Ex. 1, R 023863-64).

26.    CMS estimated the New Rule would increase enrollment at a rate of 60,000 people per year through 2028. (Grp. Ex. 1, R 023847).

27.    Defendant Agencies stated that the purpose of their change was to "encourage enrollment in comprehensive coverage and lower the risk that STLDI" is "viewed or marketed as a substitute for comprehensive coverage," as well as help "ensure that consumers can better understand and properly distinguish STLDI…from comprehensive coverage, and access resources to learn more about their health coverage options" and hopefully reduce instances where someone is "misled into enrolling in STLDI or fixed indemnity excepted benefits coverage as an alternative to or replacement for comprehensive coverage." (Grp. Ex. 1, R 023840, 023846).

28.    At that time, Defendants estimated there could be 1.5 million people currently enrolled in STLDI, and acknowledged that the number was lower than previous estimates, subject to changes, and that it "likely underestimate[d] the number of enrollees in STLDI…and the Departments are not aware of another available source for these data," and that Defendants relied on estimates as to the number of issuers of STLDI but were ultimately "uncertain how many individuals are currently enrolled in STLDI" and how the New Rule "will affect enrollment" in STLDI. (Grp. Ex. 1, R 000043, 000048, 023844-45, 023849, 023851).

29.    Some comments estimated STLDI enrollment as follows: "millions" of "people use and want" STLDI;  "perhaps 3-5 million;" "unknown…estimates" ranging from 1.5 to 3 million enrollees; "several million"; millions were "currently covered…and the proposed rule would eliminate their choice;" "millions of Americans…are very satisfied;" "nearly 2 million Americans [are] caught in a Medicaid donut hole because they make too much for Medicaid; too little for Obamacare…Eliminate the gap on a state-by-state basis;" "millions of Americans, including many Georgians rely on these benefits to bridge financial gaps left by comprehensive health insurance during times of need," "millions of Americans, including many North Carolinians rely on" them;

and the New Rule "will in effect eliminate health insurance for millions of essential workers" nationwide. (Grp. Ex. 1, R 000088, 000120, 000132, 0001542, 012010, 012994, 017156, 017520, 018682, 018956, 019131-32, 019142, 019336-38, 019553, 020099-101, 020292, 020516, 020524, 020541, 020617, 020885-87, 021761, 021845, 022127, 022402, 023144, 023336, 023771-72).

30.      Defendants stated they never acquired the "number of small issuers of fixed indemnity excepted benefits coverage," the "number of [STLDI] issuers… that would be affected," and "the number of agents and brokers that currently enroll individuals in STLDI," and Defendants "acknowledge[d] that they have limited data on enrollment in STLDI" but that it was "sufficient …to conclude that the changes" from the 2018 Rule "were appropriate and justified" and "necessary and appropriate to combat deceptive marketing practices, distinguish STLDI from individual health coverage, and address changes in the legal landscape" since 2018. (Grp. Ex. 1, R 000048, 023803, 023845-46, 023854).

31.      The New Rule stated that Departments "sought information on the number of agents and brokers who sell STLDI, fixed indemnity excepted benefits coverage, and individual health insurance coverage, respectively, and how their compensation might be affected by the provisions proposed in" the proposed rule leading to the New Rule," and Defendants acknowledged uncertain incurred costs and "market disrupting impact," as well as "non-quantified" increases in premium costs and healthcare costs for those leaving STLDI plans, "non-quantified" increases in the number of uninsured people, "non-quantified" decreases in agent and broker compensations, "non-quantified" costs to States and State departments from the lack of competition and lack of a viable alternative will hurt the consumer and expressed hopes: to not place "unreasonable burdens" on STLDI issuers, to "clearly distinguish STLDI from individual health insurance coverage," help limit consumer confusion during enrollment, "and increase consumer awareness of coverage options." (Grp. Ex. 1, R 023793, 023802-03, 023841, 023848-49 023855).

32.     Defendants acknowledged a risk that some individuals may "lose coverage and must wait until the next annual individual market open enrollment period . . . or may choose to become uninsured" and that an uninsured may face a "health crisis" (R 23810, 23848, 23851).

33.     Defendants stated: that it is possible and "important to provide consumers with concise, accurate information to evaluate insurance products, so that consumers may make informed decisions about health insurance coverage;" that *Healthcare.gov* "provides additional information" to limit confusion; that STLDI-issuers could convey "key differences between comprehensive coverage and STLDI before completing the sale or renewal so consumers can make informed decisions;" and that the 2018 Rule had required written warning notices (Grp. Ex. 1, R 23814-15, 23819-21).

34.     Defendants noted several states and the D.C. enacted wide-ranging legislation after the 2018 Rule and acknowledged concerns of McCarran-Ferguson Act preemptions, that certain states had limited time periods and others prohibited STLDI, resulting in state "patchwork," "generally agree[d] that States retain the authority to regulate STLDI" with an "important role in regulating STLDI", that they "recognize[d] the federalism implications" of their Rule. (Grp. Ex. 1, R 23803-04, 283844).

35.     At the time of issuing the New Rule, Defendants explained that they "appreciate[d] these comments and suggestions and will take them into consideration in any future regulations or guidance defining STLDI," with a potential for such regulations in the future. (Grp. Ex. 1, R.23802, 023814).

36.     Defendants also acknowledged "stacking," which was the process of consecutive renewal of STLDI policies, and included the New Rule's stacking prohibitions (Grp. Ex. 1, R 23809-10, 23838).

37.     Defendants identified areas in which it lacked analytics regarding the New Rule as follows:

- "However, the Departments lack data about the number of agents and brokers that currently enroll individuals in STLDI or fixed indemnity excepted benefits coverage and did not receive any additional data from commenters." (Grp. Ex. 1, R023845-46).

- "However, due to a lack of data, the Departments were unable to precisely estimate how many agents and brokers might be affected by the 2023 proposed rules and the magnitudes of the potential changes in compensation.350 The Departments solicited comments on the number of agents and brokers who sell STLDI, fixed indemnity excepted benefits coverage, and individual health insurance coverage, respectively, and how their compensation might be affected by the 2023 proposed rules." (Grp. Ex. 1, R 23854).

- The New Rule ultimately concluded that "due to a lack of data and information, there are several areas of uncertainty regarding the potential market impacts of these final rules. As a result, there is also some uncertainty about the potential impact on the compensation of agents and brokers." (Grp. Ex. 1, R 023855).

38.     The New Rule, contained Table 1, entitled "Accounting Table," stating that the New Rule could not quantify the following "Costs" (Grp. Ex. 1, R23841):

- "Potential increase in premium costs for individuals who switch from STLDI or fixed indemnity excepted benefit coverage (when used as a substitute for comprehensive coverage) to comprehensive coverage and who are not eligible for the PTC."

- "Potential increase in the number of uninsured individuals or the number of individuals experiencing a coverage gap, if some individuals with STLDI coverage purchased after the applicability date are no longer able to renew or extend their current policy, choose not to purchase a new policy from another issuer of STLDI, and can only obtain comprehensive coverage during open enrollment, or choose not to purchase comprehensive coverage."

- "Potential decrease in compensation for agents and brokers if there is a reduction in sales of STLDI and fixed indemnity excepted benefits coverage."

- "Potential increase in health care spending, if individuals switch from STLDI or fixed indemnity excepted benefits coverage (when used as a substitute for comprehensive coverage) to comprehensive coverage and increase their use of health care as a result."

- "Potential costs to States, if States enact or implement new legislation in response to these final rules."

- "Potential costs to State departments of insurance associated with reviewing amended marketing materials and plan documents filed by issuers of STLDI and fixed indemnity excepted benefits coverage in response to these final rules."

## STANDARD OF REVIEW

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found" to be "arbitrary, capricious," or "otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C). The APA's mandatory language empowers courts to vacate, or "'set aside—*i.e.*, formally nullify and revoke—an unlawful agency action'" without "consideration of the various equities at stake." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951-52 (5th Cir. 2024). Review of agency actions ordinarily is limited "to evaluating the agency's contemporaneous explanation in light of the existing administrative record," unless there is a "strong showing of bad faith or improper behavior" on the part of the agency. *Biden v. Texas*, 597 U.S. 785, 811 (2022) (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) (noting findings of bad faith or improper behavior, may warrant further inquiry and extra-record discovery).

## ARGUMENT

**I.  Defendants' New Rule fails to satisfy APA Section 706 Review, as it is unlawful, arbitrary and capricious, and capable of repetition and regulatory whiplash with election cycles.**

Section 706 provides that the Court must decide "all relevant questions of law…and determine the meaning or applicability of the terms." 5 U.S.C. § 706. Through that Section, Congress required the Courts to check administrative powers and **"**hold unlawful and set aside agency action, findings, and conclusions found to be" unlawful or arbitrary and capricious, and unconstitutional exercises of agency power. *Id.* at (2)(A-B). This is one of those cases.

### a. *STLDI is an ambiguous phrase, and Defendants' tangential interpretations are unlawful, arbitrary and capricious.*

The "text of a law controls over purported legislative intentions unmoored from any statutory text," and a court "may not replace the actual text with speculation as to Congress intent." *Corner Post, Inc. v. Bd. of Gov. of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2454 (2024). The term "STLDI" is ambiguous. *See Assoc. for Comm. Affiliated*, 966 F.3d at 788-89 (concluding ambiguity, reasoning, "it's perfectly reasonable to describe a 364-day policy as 'short-term'" for STLDI). And "under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous" *Loper Bright*, 144 S. Ct. at 2273. Rather, ambiguities involving claimed delegations are to be construed "against the government with lenity toward" the affected. *Id.* at 2286. *W. Virginia v. EPA,* 597 U.S. 697, 723 (2022).

But "resolution of statutory ambiguities involves legal interpretation," and that "does not suddenly become policymaking just because a court has an 'agency to fall back on.'" *Loper Bright*, 144 S. Ct. at 2268. Resolution of ambiguities against the government following changes to the law ensures that "rather than impose the costs of ambiguity on presumptively free persons," power remains firmly in the legislative branch and promotes congressional clarity. *Wooden v. U.S.*, 595 U.S. 360, 391 (2022) (Gorsuch, J. concurring); *see also Loper Bright*, 144 S. Ct. at 2286 (Gorsuch, J., citing same, concurring, the rule of lenity "fortifies the separation of powers").

Ambiguity "of certain words or phrases may only become evident when placed in context.'" *See King v. Burwell*, 576 U.S. 473, 486, 497, (2015) ("Our duty, after all, is 'to construe statutes, not isolated provisions," and an asserted meaning may be "untenable in light of the statute as a whole."). In promulgating the New Rule, the Defendants say that STLDI means two things: a terminal period of four months and an unprecedent implied broad power to completely prohibit "stacking" of STLDI policies. *See Loper Bright*, 144 S. Ct. at 2261 ("Under the APA, it thus

12

'remains the responsibility of the court to decide whether the law means what the agency says.'"). But Defendants lack anything from Congress that provides a fixed number of months for STLDI and, furthermore, cannot identify something enabling a broad power to prevent stacking. Rather, context shows Defendants had a decades-long interpretation that they briefly abandoned in 2016. SOF, ¶¶1-7. Even back then, however, Defendants conceded that prohibiting stacking was both "not warranted" and unfeasible. SOF, ¶9.

Then in 2024, Defendants tried again to change their minds and slip in stacking prohibitions. SOF, ¶25. This lack textual basis—as the D.C. Circuit previously rejected that STLDI's "limited" and "nonrenewable" are synonymous. *Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of the Treasury*, 966 F.3d 782, 789 (D.C. Cir. 2020). It ruled that "nothing in HIPAA prevents insurers from renewing expired STLDI policies," and "from 1997 to 2016, renewals were allowed with the insurer's consent." *See Id.* But even well before the *Chevron*'s overturn, that court acknowledged that changes to STLDI must always satisfy the APA. *Id.* at 792-93. Indeed, agencies can "change their existing policies," but only if "they provide a reasoned explanation for" changes. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Defendants' New Rule lacks such reasoning.

### i. *The changes from the existing 2018 Rule do not meet the tripartite test to surmount arbitrary and capriciousness.*

All agency changes must be (1) "permissible under the statute," (2) supported by "good reasons for it," and (3) and the agency must consciously believe those changes to be better. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The D.C. Circuit only ruled in the context of "expanding the length of STLDI plans," not drastically reducing them and prohibiting stacking—such as Defendants have done in the New Rule. *See Ass'n for Cmty. Affiliated Plans*, U.S. App. D.C. at 290-911.

13

### 1. Prohibiting "stacking" and flexibly setting changeable terms is baseless under the statutory text and, thus, unlawful.

The Supreme Court has asserted necessary skepticism when an agency claims sizeable power fluctuate standards without a fixed metric. *See W. Virginia*, 597 U.S. at 733 (doubting E.P.A.'s power, noting, "[i]t is one thing for Congress to authorize…a preset cap, or a cap that must be based on some scientific, objective criterion, such as the NAAQS. It is quite another to simply authorize EPA to set the cap itself wherever the Agency sees fit."). Agency permissibility cannot exist without standards, because the agency only can "respond to [a] problem" with "reasonable guidelines" to do so. *See Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 766, 768 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2490 (2024) (acknowledging "*when* and *how* the agency must act" needs to be "clearly delineate[d]" to avoid "the line where the scope of its power is too great for the standard imposed" by Congress). The Supreme Court, in *Loper Bright*, also provided examples of the type of Congressional language that has historically supported express delegations to agencies. *Loper Bright*, 144 S. Ct. at 2263, n. 5.

The Fifth Circuit's nondelegation analysis shows that courts are not to "rubber-stamp all delegations of legislative power." *Big Time Vapes, Inc. v. F.D.A.*, 963 F.3d 436, 443 (5th Cir. 2020). There, the court considered the agency's confined binary analysis, simply whether-or-not an emerging product was "tobacco" was a narrow and defined category of other "tobacco products" distinguishable from "limitless delegation[s]." *Id.* at 438, 443-45. Here, Defendants conversely assert a limitless delegation of months and new prohibitions—exceeding constitutional bounds.

Broad agency power to fundamentally change a scheme does not flow presumptively. Rather, "power has limits" and Defendants cannot "rewrite that statute from the ground up." *See Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (noting *e.g.* simple "statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by

Congress.") (quoting *MCI Telecomm. Corp. v. American Telephone & Telegraph Co*., 512 U.S. 218, 225 (1994)). But Defendants ask just that. They use a limited grant of authority under 42 U.S.C. § 300gg-92, which provides that the Departments may "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of HIPAA's subchapter—an Act which, nevertheless, excepted STLDI from individual regulations. Defendants invoke those simple words as power to regulate the entire STLDI industry in ways they previously thought impossible.

### 2. *The New Rule lacks a reasoned and nonconclusory explanation for the sudden departure from the 2018 Rule.*

The D.C. Circuit previously explored many faults in the 2016 Rule that Defendants amplified in their New Rule. The court had noted that adults who lose ACA coverage must qualify for a special enrollment period," subject to: re-underwriting risks, greatly increased premiums, loss of deductibles, and lack of coverage because "a person who loses STLDI coverage typically must wait until the next open enrollment period to obtain ACA-compliant coverage on the Exchanges." *Ass'n for Cmty. Affiliated Plans*, 966 F.3d at 793. Thus, the purposefully-longer running of STLDI policies (and long-standing definition) "for just under one year ensures that individuals can always purchase a policy to fit their need for temporary coverage." *Id.*

Defendants' sudden disregard came as follows. Since 1996, according to Congress, "health insurance coverage offered to individuals in the individual market" did "not include [STLDI]," and even 24 years later, when Congress massively overhauled healthcare—it still kept that definition in the ACA and did not change STLDI, nor even refer to it. *Ass'n for Cmty. Affiliated Plans*, 966 F.3d at 784–85, 788; SOF, ¶¶ 1-6. According to the agencies, from 1997-2016, STLDI meant such contractual coverage expiring "within 12 months of" effectiveness. SOF, ¶¶ 4-5.

Briefly, in 2016, agencies worried that people used STLDI as a primary form of health coverage—contrary to ACA mandates—and that some issuers were exceeding the 12-month term

"adversely impacting the risk pool" of ACA insurance. *Id.* at ¶ 7. Those agencies decided that STLDI should "be less than three months," but still did not restrict stacking. *Id.* at ¶¶ 7-9. But in 2017, Congress quickly responded, enacting the TCJA, removing the penalties and nullifying the penalties previously imposed under the ACA. *Id.* at ¶ 10. This had the legal effect of a Congressional repeal of ACA's penalties and individual mandate. *See generally U.S. v. Bodiford*, 753 F.2d 380, 382 (5th Cir. 1985) ("*Nulla poena sine lege* is not only an ancient maxim; it is a requisite of due process."). In 2018, the agencies' proposed a reversion back to the longstanding STLDI definition, which resulted in an increase of STLDI and record-breaking numbers of ACA enrollment from 2018 to 2024. *Id.* at ¶¶ 11-16, 20-24.

In *Encino Motorcars*, the Supreme Court revived that a regulation that reinterpreted Congress' meaning of "salesman," which like this case had a constant application for multiple decades—indicating that servicemen were exempt from overtime requirements. 579 U.S. at 214-18. But in 2008, the agency proposed otherwise, and then in 2011, did so again. *Id.* at 218. The Court reasoned agencies *can* change existing policies, but where an agency "has failed to provide" sufficient analysis, its action is arbitrary and capricious and, therefore, "cannot carry the force of law." *Id.* at 220 (citing Section 706(2)(A)).

Agency requirements, therefore, differ when the agency has "a new policy created on a blank slate," versus—like here—departing from standing policies. *Id* at 221. The agency change requires "a more reasoned explanation for its decision to depart from its existing enforcement policy," facts and circumstances. *Id.* at 221-22. "[U]nexplained inconsistency" in agency policy is unlawful, arbitrary and capricious, and "conclusory statements do not suffice to explain [the] decision," nor do favorable public comments. *Id.* at 221-22, 224-25. Even amid *Chevron* deference, "[u]nexplained inconsistency" remained among various "reason[s] for holding an interpretation to

be an arbitrary and capricious change from agency practice under the [APA]." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981 (2005).

Rather, Defendants inexplicably departed from longstanding policy and acted contrary to Congress' intent under the 2017 TCJA—while public comment cautioned Defendants against it. SOF ¶29. Defendants conceded there were immense risks and conceded their failure to gather necessary analytical data, simply identifying it as "non-quantified" unknowns—as well as admitting ample existing resources to provide public warnings and clarifications under the 2018 Rule and via Healthcare.gov. SOF¶¶28-38. Defendants acknowledged there may be up to 3 million STLDI insureds against the backdrop of continually increasing record-breaking ACA enrollment—while their changes would only bring 60,000 ACA members. SOF ¶¶22-26. This is the type of arbitrary and capricious change that *Encino* contemplated. There is no "rational connection between the facts found and [Defendants'] choice made." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. Thus, but for a few months in 2016 where agencies claimed otherwise, from 1996-2024, consideration of history and past practice cuts against Defendants. *Biden*, 143 S. Ct. at 2379-80 (Barrett, J., concurring).

### 3. Record-breaking ACA enrollment under the 2018 Rule belies any requisite conscious belief that these changes are better.

Administrative gap-filling cannot be inconsistent with the statutory language and past practice under the statute. *See Biden*, 143 S. Ct. at 2372 (*Nebraska v. Biden*, 636 F. Supp. 3d 991, 995 (E.D. Mo. 2022) (The plaintiffs proceeded under APA, arguing separation of powers violation)). The meaning of STLDI remains fixed in 1996. Every statute "no matter how impenetrable," must "have a single, best meaning," which is "fixed at the time of enactment." *Loper Bright*, 144 S. Ct. at 2266 (quoting *Wis. Central Ltd. v. U.S.*, 585 U.S. 274, 284 (2018)). Congress only said what STLDI was not (i.e., not "individual health insurance coverage."), but it did not

specify what STLDI was beyond the 1996 use of the words "short-term limited duration insurance." 42 U.S.C. § 300gg-91(b)(5).

In 1996, according to Webster's Dictionary, "short-term" meant "covering or involving a relatively short period of time" and "(of a capital gain or loss) derived from the sale or exchange of an asset held for less than a specified time, as six months or one year." (Ex. 10, THE RANDOM HOUSE WEBSTER'S COLLEGE DICT. 1240 (1st ed. 1996)). Defendants' limit of three months reads into the meaning of the word something that was not intended at the time. Likewise, Defendants prohibitions against renewals, prohibiting "stacking," converts "limited" into nonrenewable. In 1996, "limited" was defined as "confined within limits; restricted or circumscribed." *Id.* at 787. But "nonrenewable" is not synonymous with "limited." *Ass'n for Cmty. Affil. Plans*, 966 F.3d at 789. In 1996, nonrenewable meant the opposite of "to begin or take up again; resume," or "to make effective for an additional period." (Ex. 10, WEBSTER'S at 921, 1140). Congress did not say STLDI was nonrenewable; it said "limited." Like *Encino*, whatever Congress intended in 1996 was not what Defendants unprecedentedly divined 28 years later. And Because HIPAA definitions were cross-referenced with the ACA, 1996 remains the year of reference, "bring[ing] the old soil with it." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (quoting *Hall v. Hall*, 584 U.S. 59, 73 (2018)).

### ii. The year-to-year and election-to-election uncertainty and variability, further shows arbitrary and capriciousness under § 706(2)(A).

Agency authority is doubtful where it asserts "authori[ty]. . . to change positions as much as it likes" because that creates "regulatory whiplash." *Loper Bright*, 144 S. Ct. at 2272, 2284-85 (Gorsuch, J., concurring, acknowledging the Judiciary concludes fixed meanings, "not those currently wielding power in the political branches;" otherwise, "how could people ever be sure of the rules that bind them?"). A law's meaning is meant to be free of "influence from the political branches" not meant to whiplash "year-to-year and election-to-election" as it breeds uncertainty

with election cycles. *Id.* at 2257; *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001) (the opinion's unanimous part IV found that the EPA's interpretation was "unreasonable" where "nothing in the EPA's interpretation would have prevented the agency from aborting [it] the day after it was enacted.").

Defendants' STLDI scheme breeds such uncertainty. The D.C. Circuit, then-bound by *Chevron*, recognized STLDI's potential for subsequent administrative whiplash and that it was then-bound by *Chevron. See Ass'n for Cmty. Affil. Plans*, 966 F.3d at 781-91, 794 ("expanding the length of STLDI policies is the Departments' bailiwick," and "we cannot substitute our judgment for theirs."). So did the briefs in *Loper Bright*—in which friends of the Court aptly cautioned that Defendants' "ongoing saga involving… STLDI" was the type of fluid "interpretation[]…which can shift wildly with every new administration." Brief for the Foundation for Government Accountability as Amicus Curiae, 2023 WL 4766064, at **18-19, *Loper Bright*, 144 S. Ct. 2244.

But that bailiwick has since changed. *See generally Big Time Vapes, Inc.*., 963 F.3d at 443 ("[i]f we are ever to reshoulder the burden of ensuring that Congress itself make the critical policy decisions, these are surely the cases in which to do it."). The U.S. Supreme Court overturned *Chevron* and instructed how the major questions doctrine restricts agency rule-making. *See Loper Bright*, 144 S. Ct. at 2267 ("interpretive issues arising in connection with a regulatory scheme often 'may fall more naturally into a judge's bailiwick' than an agency's.").

Like the inexplicable whiplash in *Encino Motorcars*, Justice Gorsuch's concurrence in *Loper Bright* illustrated a defect that pervades STLDI, citing *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981-982 (2005), in which one agency rule had been volleyed across four different presidential administrations with four rules rescinding the last, and each declaring itself to be "just as 'reasonable' as the last." *Loper Bright*, 144 S. Ct. at 2288. Similarly, in *Biden v. Nebraska*, even the dissent conceded the agency's amorphous use of the

underlying Act. 143 S. Ct. at 2385 ("When COVID hit, two Secretaries serving two different Presidents decided to use their HEROES Act authority," one to temporarily suspend the other to permanently forgive).

This is precisely what Defendants want to remain authorized to do "in the future." SOF ¶35. But each Article II administration is limited to a scheme of which only Congress can delegate within constitutional bounds. Here, Congress failed to restrict STLDI seven times between 2019 and 2022. SOF ¶18. And six years earlier, Defendants understood they could not prohibit stacking. SOF ¶9.

### b. Defendants' attempt to divine Congressional delegation is contrary to constitutional power under § 706(2)(B)—in violation of Article I and II.

An "ambiguity is not a delegation to anybody, and a court is not somehow relieved of its obligation to independently interpret the statute," and discretionary authority remains subject to "constitutional limits" *Loper Bright*, 144 S. Ct. at 2266, 2268, 2273. But even if "the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 2263. A delegation can only be proper when Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform," establishing the clear bounds of the "confer[red] decisionmaking." *Whitman*, 531 U.S. 457, 472.

The core concept of the nondelegation doctrine is entwined in the Constitution's separation of powers. *See Id.* at 487 (Thomas, J., concurring, "none of the parties to these cases has examined the text of the Constitution" and "whether our delegation jurisprudence has strayed too far from our Founders' understanding of separation of powers."). *Loper Bright* was more than just an overturn of *Chevron*; its purpose was to reestablish constitutional balance among the branches and stave off agencies from continually "chang[ing] course…when Congress has given them no power to do so."

*Loper Bright*, 144 S. Ct. at 2272. *See Id.* at 2275 (Thomas, J., concurrence, cautioning "agencies' power beyond the bounds of Article II by permitting them to exercise powers reserved to another branch of Government."); *see also Id.* at 2275, 2278 (Gorsuch, J., concurring it "returns judges to interpretive rules that have guided federal courts since the Nation's founding," wherein, Article I "vests the power to enact federal legislation exclusively in the people's elected representatives in Congress," and Article V is the only way to amend those processes. *Id.* Indeed the dissenters noted the decision's impact. *See Id.* at 2295, 2310 (Kagan, J., dissenting, there is "power over every open issue—no matter how expertise-driven or policy-laden—involving the meaning of regulatory law."); *see also Corner Post, Inc.*, 144 S. Ct. at 2482 (Jackson, J., dissenting, "every legal claim…can possibly be brought before courts newly unleashed from the constraints of any such deference" with "potential to devastate…"). Like *Biden v. Nebraska*, "this is a case about one branch of government arrogating to itself power belonging to another…the Executive seizing the power of the Legislature." *Biden*, 143 S. Ct. at 2373.

### i. Defining STLDI', where Congress did not, is the duty of the Judiciary.

The Constitution's Article I expects Congress "to make the big-time policy calls itself, rather than pawning them off to another branch." *Biden*, 143 S. Ct. at 2380 (Barrett, J., concurring). Under Article III, the Judiciary retains power to adjudicate "all Cases, in Law and Equity," and all "Controversies to which the United States shall be a Party." U.S. Const. Art. III. Sec. 2, Cl. 1. The duty to legislate important subjects is discrete from delegating "the details." *Wayman v. Southard*, 23 U.S. 1, 43 (1825). Laws will be "'more or less obscure and equivocal, until their meaning' was settled 'by a series of particular discussions and adjudications.' *Loper Bright*, 144 S. Ct. at 2257. But no matter the "authoriz[ation]" and "will of the President," it remains "emphatically the province and duty of the judicial department to say what the law is," and "not to be guided by the will of the President." *Marbury v. Madison*, 5 U.S. 137, 138–39, 158, 177 (1803).

No different than the President, Congress cannot surmount the Constitution. Nor can the agencies that traverse Article I and II branches. *Decatur v. Paulding*, 39 U.S. 497, 515 (1840); *U.S. v. Dickson*, 40 U.S. 141, 162 (1841). Respect for any other branches, cannot supersede the Judiciary's unwaivable informed judgment. *Loper Bright*, 144 S. Ct. at 2247.

The Judiciary must "identify the meaning of a text rather than allow the Executive Branch to displace it." *Loper Bright*, 144 S. Ct. at 2271. Even where Congress has ratified, conflicting phrases or "inartful drafting," it is the Court that helps to find a fixed constitutional meaning—not an agency via a "winding path of connect-the-dots provisions." *See Burwell*, 576 U.S. at 491, 497 (declining to vest the IRS with the interpretive powers for tax-credits). But that has its limits. Where "Congress enacted into law something different from what it intended, then it [must] amend the statute to conform it to its intent" because it is beyond the Court's "province to rescue Congress from its drafting errors." *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534, 542 (2004) ("when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.").

The adherence to separation of powers and supremacy of legislative text bears a well-settled accepted risk of "harsh outcome[s]." *Id.* at 538; *see also Whitman*, 531 U.S. at 471 ("No matter how severe the constitutional doubt, courts may choose only between reasonably available interpretations of a text."). Even at that, the words cannot be "understood independent of context." *See Id.* (Breyer, J., concurring in-part). It is implausible that what was "necessary or appropriate" to effect a subsection of HIPAA can connect-the-dots to grant Defendants a fluid and subjective power to annually revisit what STLDI means and to prohibit stacking a quarter century later. *See generally Biden*, 143 S. Ct. at 2374 (rejecting agency "sweeping and unprecedented" attempt, concluding that "Congress did not" have "such power in mind" 22 years earlier).

Congress (Article I) never imposed nor delegated STLDI time-limits. It is accepted among academics that "Congress knew how to impose time limits but did not do so for STLDI plans." § 144:13. GENERALLY, 10A COUCH ON INS. § 144:13 (citing *Ass'n for Cmty. Affil. Plans*, 966 F.3d at 785, 788-90 (noting "STLDI policies were not subject to many of the ACA's key reforms, which applied only to 'individual health insurance coverage,'" that "the phrase '[STLDI]' does not appear in the ACA," and "'[d]espite the ACA's sweeping reforms,' Congress 'left intact and incorporated' the STLDI exception."). Congress' failed attempts show that it knew this was an Article I exercise of power—a bridge too far for any other branch. Even under the late-*Chevron* doctrine, courts were required to "reject administrative constructions which are contrary to clear congressional intent." *Loper Bright*, 144 S. Ct. at 2264.

But Defendants ostensibly now ask this Court and the public to not take them at their word back then. Defendants also seek a conclusion that since 1996, their fluid legislative power has been waiting to be stumbled upon, yet always proper and prime for promulgation. Not so. The *Whitman* Court identified examples of Congressional language that distinguishably could delegate and constitutionally cabin agency power. *Whitman*, 531 U.S. at 473. There is no such enabling language here. Defendants' exercise of power contravenes separations of power analysis. *See Whitman*, 531 U.S. 457, 487 (Thomas, J., concurring some delegations may be "simply too great for the decision to be called anything other than 'legislative.'").

Instead, Defendants attempt a tangential end-around through HIPAA, citing the ACA. *See e.g. Biden*, 143 S. Ct. at 2370  ("Because the Secretary cannot waive a particular provision or provisions to achieve the desired result, he is forced to take a more circuitous approach, one that avoids any need to show compliance with the statutory limitation on his authority."). But this "cannot be justified by such sleight of hand" because Defendants' ability—however broad the meaning of necessary and appropriate was meant to be in 1996—has not changed to allow

23

"exhaustive rewriting." *Id.* at 2370-71. "Necessary" meant "essential, indispensable, or requisite." (Ex. 10, WEBSTER'S at 903). "Appropriate" meant "particularly suitable; fitting; compatible" and "set apart for a specific purpose or use." *Id.* at 68. It is illogical to posit that the New Rule STLDI prohibitions and changes are essential, indispensable, particularly suitable, and specifically purposed where they had never been imposed in in 28 years. Likewise, it is disingenuous for Defendants to purport public confusion and lack of awareness with record-breaking multimillion ACA-enrollment versus a change to garner merely 60,000. SOF ¶¶22-26.

   c. ***Should this Court impose § 706(a) vacatur and elect to not define STLDI, the previously-upheld 2018 Rule that did not administratively legislate-away "stacking," would remain in place.***

   Under the APA, Congress "empower[ed] federal courts to 'hold unlawful and set aside agency action' that…is arbitrary and capricious" or unlawful. *Corner Post, Inc.*, 144 S. Ct. at 2460-63 (Kavanaugh, J., concurring, quoting 5 U.S.C. § 706(2), citing *Harmon v. Thornburgh*, 878 F.2d 484, 495, n. 21 (CADC 1989) ("the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.")). The Section 706 vacatur of the New Rule results in reversion to the 2018 Rule with no disruption to the historical administrative landscape. *See Id.* at 2467 ("§ 706(2) directs federal courts to vacate agency actions in the same way that appellate courts vacate the judgments of trial courts.").

   There are relevant differences between the New Rule and the 2018 Rule. The 2018 reversion previously withstood a court of review's scrutiny as not being arbitrary and capricious. *Ass'n for Cmty. Affil. Plans*, 966 F.3d at 792. While the D.C. Circuit relied upon *Chevron*, its ruling remains in effect unless formally addressed or overturned. *See Loper Bright*, 144 S. Ct. at 2273. It reasoned that the 2018 Rule "had defined the term almost exactly" with past-practice, which was "powerful evidence" that the 2018 Rule "is consistent with the ACA." *Id.* at 790. The 2018 Rule also

distinguishably did not take away from the length, and nothing has prohibited stacking since STLDI's genesis. The 2024 cannot withstand that scrutiny.

### d. Defendants' failure to comply with the Regulatory Flexibility Act § 706(2)(D-E)— without observance of RFA procedure and substantial evidence.

The Regulatory Flexibility Act required that Defendants conduct a regulatory flexibility analysis, resulting in "a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply" and offering "any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any increase in the cost of credit for small entities" 5 U.S.C. § 603(b)(3) and (d)(1)(b). The New Rule feigned compliance with the RFA, by including conclusory statements about its efforts seeking information and determinations of which it was ultimately uncertain. The New Rule is also replete with admissions that the regulatory flexibility analysis was simply not done regarding numbers of STLDI issuers and the number of agents and brokers that currently enroll individuals in STLDI" and its Table reflecting immense uncertainty with "non-quantified" increases and decreases of coverage and cost, and broad estimations—conceding individuals would lose coverage between enrollment periods.  SOF ¶¶ 28-33. Despite conceding available alternatives, Defendants did not examine them before employing its broad regulatory scheme. SOF ¶ 33.

The New Rule also does not satisfy the Significant Alternative requirements of the RFA because the purported intent of the New Rule is to distinguish STLDI plans from comprehensive health insurance and "increase consumer awareness of coverage options." SOF ¶ 31. Instead, there was a slew of Significant Alternatives provided to Defendants as part of the comments submitted, to which Defendants simply responded that they "appreciate these comments and suggestions and will take them into consideration in any future regulations or guidance defining STLDI." SOF ¶ 35. And the New Rule also does not satisfy § 608 of the RFA because there is no evidence of "an

emergency that makes compliance…impracticable," thereby alleviating Defendants from their obligations to promulgate administrative rules in accordance with the RFA. 5 U.S.C. § 608(a).

The New Rule equates duration and renewals with a consumer awareness, but there is no evidence or support for how limiting duration of STLDI plans fosters "consumer awareness of coverage options." SOF ¶31. Thus, the changes are a *de facto* prohibition of these plans and the New Rule is violative of the RFA.

### e. Defendants' New Rule infringes upon states' statutory reverse-preemption rights and authority under the McCarran Ferguson Act, violating § 706(2)(C).

Congress enacted the 1947 McCarran-Ferguson Act, 15 U.S.C. §1012, permanently vesting certain regulatory powers to states and limiting its own powers. Under §1012(a), "the business of insurance, and every person engaged therein, shall be subject to" state laws "which relate to the regulation or taxation of such business." *Id.* at (a). The Act was committed to a "public interest in having the States continue to serve their traditional role as the preeminent regulators of insurance in our federal system and indicates the special status of insurance in the realm of state sovereignty." *Munich American Reinsurance Co. v. Crawford*, 141 F.3d 585, 595 (5th Cir. 1998).

There is no question whether Congress somehow intended to leave ambiguities in this scheme and deprive states of their rights. 15 U.S.C. § 1011 provides that "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation" of the business of insurance "by the several States." *Id.*; *see Nebraska ex. rel. Wagner v. J.A. Jones Construction Co. (In re Amwest Surety Insurance Co.)*, 245 F. Supp. 2d 1038, 1043 (D. Neb. 2002).

Accordingly, "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance…"). Congress

only carved-out certain exceptions to the business of insurance—the 1890 Sherman Antitrust Act, the 1914 Clayton Act, and the 1914 Federal Trade Commission Act—to the extent they applied "to the business of insurance" and only "to the extent that such business is not regulated by State law." *Id.* Otherwise, "a federal statute is reverse-preempted by a state statute or law. *Nebraska ex. rel. Wagner*, 245 F. Supp. 2d at 1043; *see generally Riverview Health Institute LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 519 (6th Cir. 2010) (finding reverse-preemption of RICO where it would impair Ohio's insurance regulatory scheme); *Ojo v. Farmers Group*, 600 F.3d 1205, 1209 (9th Cir. 2010) (finding the Act can reverse-preempt the FHA).

Courts have interpreted the state-situated "business of insurance" by three primary criteria: first, it has the effect of transferring or spreading a policyholder's risk; second, it is an integral part of the policy relationship between the insurer and the insured, and third, it is limited to entities within the insurance industry. *Kentucky Ass'n of Health Plans v. Miller*, 538 U.S. 329, 333 (2003). Here, firstly, Defendants have made clear that the purpose of restricting STLDI was to adjust policyholder risks. SOF ¶31. Secondly, STLDI is the direct manifestation of a relationship between insurers and insureds. Thirdly, STLDI is a function of the insurance industry, which was actively subject to proper state-regulatory efforts. SOF ¶¶ 14, 16-19, 35. Indeed, Defendants acknowledged that McCarran-Ferguson may preempt the New Rule, conceded "federalism implications," and acknowledged that it caused states non-quantified regulatory costs under the New Rule. SOF ¶¶31, 35. Thus, the restriction of STLDI affects the business of insurance and the rights of the states to restrict it. And courts are to guard against centralization of local domains where Congress has not explicitly intended federal control. *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 154 (1944).

**II. This question of deep economic and political significance is one that Congress would have expressly assigned to Defendants—pursuant to the Major Questions Doctrine.**

The major questions doctrine pertains to any "question of deep 'economic and political significance' that is central to [a] statutory scheme," wherein if "Congress [had] wished to assign that question to an agency, it surely would have done so expressly." *Burwell*, 576 U.S. at 486. Questions involving billions of dollars in annual spending and affecting health insurance costs for millions of people "is one of those cases." *Id.* Accordingly, significant cases of "expansive authority" exercised by an agency require clear Congressional intent. *See Alabama Ass'n of Realtors v. Dep't of H.H.S.*, 594 U.S. 758, 765 (2021) (rejecting CDC and HHS alleged broad agency authority to issue nationwide eviction moratorium). The doctrine checks against "calamitous result[s] that Congress plainly meant to avoid." *Burwell*, 576 U.S. at 498. This exists within the Judiciary's responsibility "to say what the law is," to "respect the role of the Legislature, and take care not to undo what it has done." *Id.* The administrative record shows that Defendants do not know how many policies or individuals are actually affected by their New Rule, but it is estimated to be between 1.5 and 3 million enrollees nationwide, accounting for $5.3 billion in welfare gains. SOF¶¶ 13, 15, 21, 23, 28-29.

There can be no serious dispute that Defendants' regulatory whiplash affecting "the price of health insurance for millions of people," is one of deep economic and political significance. *Biden*, 143 S. Ct. at 2375 (identifying *Burwell* as a major questions case). Indeed, there is a presumption against "assum[ptions] that Congress entrusted" broad subjective insurance-regulatory questions such as STLDI, "to an agency without a clear statement to that effect." *Id.*; *see also Util. Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 324 (2014) ("unheralded power to regulate a significant portion of the American economy," is "typically greet[ed] . . . with a measure of skepticism" towards the agency). *See e.g. Am. Trucking Ass'ns*, 310 U.S. at 540, 542-45 (textually restricting words undefined by Congress, and refusing to extend broad agency authority over all employees because Congressional clarity was necessary).

28

The doctrine affirms that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Burwell*, 576 U.S. at 497 (quoting *Whitman*, 531 U.S. at 468 (agencies "must show a textual commitment," which "must be a clear one" because Congress "it does not, one might say, hide elephants in mouseholes."). When the D.C. Circuit addressed this matter, quoting *Burwell*, it acknowledged the major questions doctrine's application to STLDI interpretations, "we agree that the Departments may not adopt a definition of STLDI that 'would destabilize the individual insurance market,'" triggering what Congress sought to avoid. *Assoc. for Community Affil. Plans*, 966 F.3d at 791 (quoting *Burwell*, 576 U.S. at, 492). *See Biden*, 143 S. Ct. at 2378 (Barrett, J., concurring, the major questions doctrine is an "interpretive tool [of] common sense" that "'loads the dice' so that a plausible antidelegation interpretation wins even if the agency's interpretation is better."). The Supreme Court has cautioned that "modest words," "vague terms" and "subtle device[s]" purportedly granting agency authority lend to presumptions of implausibility of broad Congressional delegations. *See Whitman*, 531 U.S. at 468 ("find[ing] it implausible" that Congress granted broad powers to substantially regulate industry rates through terms, "requisite" and "adequate margin."); *see also W. Virginia v. E.P.A.*, 597 U.S. 697, 723 (2022) ("Nor does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme."). Despite this, Defendants claim subjective power to set bounds wherever they see fit.

In *West Virginia v. EPA*, the Court noted there was drastic volleying of regulations between changes in Presidential administrations and reasoning that despite "textual plausibility" of an agency's interpretation—Congress only gives massive authority to "substantially restructure" or "fundamentally revis[e]" an American industry in clear terms that otherwise demand judicial skepticism. *Id.* at 715, 722, 729, and 732. Here, there is great doubt for Defendants where the purported will of Congress, proceeding via constitutional means, failed seven times.

But in resolving STLDI's ambiguities under the doctrine, where the statutory scheme shows "Congress designed [an] Act" to avoid something, "th[at] statutory scheme compels" a court to reject an interpretation that would do just that. *Burwell*, 576 U.S. at 492-93 (citing *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 419–420 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.")). Congress repealed the ACA's individual mandate. Thus, Defendants attempt to box an non-quantified number of people into ACA plans with unavoidable results of a non-quantified resultant uninsured populus. This defies congressional intent in the TCJA and the ACA. And for that reason alone, it fails.

Had Congress intended Defendants to have abilities to prohibit "stacking" or to declare the length of STLDI at-will, it would have articulated that in a "prominent manner." *See Burwell*, 576 U.S. at 497 ("It would not have used such a winding path of connect-the-dots provisions…"). Like *West Virginia*, the question here is a "narrow" interpretive one—whether HIPAA's vague terms and modest words conferred the broad subjective authority Defendants purport under the New Rule. *See W. Virginia*, 597 U.S. at 734-35 ("A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body."). Congress did not. The New Rule, therefore, fails.

## CONCLUSION

For the foregoing reasons, Plaintiffs American Association of Ancillary Benefits and Premier Health Solutions, Inc. respectfully request that this Court grant summary judgment regarding preliminary injunction of Defendants' enforcement.

Respectfully submitted:

By:    */s/ Dominick L. Lanzito*

[SIGNATURE BLOCK ON FOLLOWING PAGE]

Lead Counsel for Plaintiffs
GONZALES TAPLIN PA
s/Dominick L. Lanzito
Alex Gonzales
Dominick L. Lanzito
*Attorneys for the AMERICAN*
*ASSOCIATION OF ANCILLARY BENEFITS*
*and PREMIER HEALTH SERVICES*
P.O. Box 171267
Austin, Texas 78717
Tele:   (512) 492-5251 (for A. Gonzales)
         (312)724-8035 (for D. Lanzito)
Emails: agonzales@gonzalestaplin.com
dlanzito@pjmlaw.com

Local Counsel for Plaintiffs
THE FOWLER LAW FIRM, P.C.
/s/ Michael J. Smith
Michael J. Smith
Texas State Bar No.24037517
3301 Northland Drive, Suite 101
Austin, Texas 78731
Telephone: 512.441.1411
Facsimile: 512.469.2975
Email: msmith@thefowlerlawfirm.com