IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
TEXAS SHERMAN DIVISION

| | |
|---|---|
| AMERICAN ASSOCIATION OF ANCILLARY BENEFITS, A FLORIDA NOT-FOR-PROFIT CORPORATION, AND PREMIER HEALTH SOLUTIONS, LLC, A TEXAS LIMITED LIABILITY COMPANY,<br><br>Plaintiffs,<br>v.<br><br><br>XAVIER BECERRA, IN HIS OFFICIAL CAPACITY, AS SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVCIES, JULIE A. SU, IN HER OFFICIAL CAPACITY AS ACTING UNITED STATES SECRETART IF KABOR, AND JANET YELLEN, IN HER OFFICIAL CAPACITY, AS SECRETARY OF THE UNITED STATES DEPARTMENT OF TREASURY,<br><br>Defendants | Case No. 24-CV-783<br><br>Judge Sean D. Jordan |

**BRIEF OF THE LEUKEMIA & LYMPHOMA SOCIETY, THE AIDS INSTITUTE, THE ALS ASSOCIATION, ARTHRITIS FOUNDATION, CANCER*CARE*, CANCER SUPPORT COMMUNITY, CROHN'S & COLITIS FOUNDATION, CYSTIC FIBROSIS FOUNDATION, EPILEPSY FOUNDATION OF AMERICA, FAMILIES USA, MUSCULAR DYSTROPHY ASSOCIATION, NATIONAL ALLIANCE ON MENTAL ILLNESS, NATIONAL MULTIPLE SCELROSIS SOCIETY, NATIONAL ORGANIZATION FOR RARE DISORDERS, AND NATIONAL PATIENT ADVOCATE FOUNDATION, AS AMICI CURIAE OPPOSING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

INTEREST OF AMICI CURIAE ........................................................................................... 1

INTRODUCTION ................................................................................................................... 4

ARGUMENT .......................................................................................................................... 7

I.  Adequate Insurance Is Critical To Health Outcomes. ............................................ 7

II.  The ACA Ensures Greater Access to Comprehensive Health Care Coverage
and has Led to Significant Decreases in the Percentage of Americans Who are
Uninsured. ............................................................................................................... 11

    A.  The ACA Prohibits Health Insurers From Engaging in Various Forms of
Discrimination. ........................................................................................... 11

    B.  The ACA Requires the Provision of Essential Health Benefits. ............... 12

    C.  Comprehensive Health Coverage and Care Are More Affordable as a
Result of the ACA. ..................................................................................... 12

    D.  Health Plans Must Now Pay a Greater Share of Health Care Costs. ......... 13

    E.  Healthcare Marketplaces Throughout the U.S. and Special Enrollment
Periods Created Under the ACA Make Healthcare More Accessible. ....... 13

III.  Lack of Time Limitations and Insufficient Notices on STLDI Plans Prior to the
2024 Rule Exposed Consumers to Significant Gaps in Coverage and High
Costs of Care Not Covered by STLDI Plans. ......................................................... 15

    A.  STLDI Plans Are Intended to Provide Short-Term, Stop-Gap Coverage. .......... 15

    B.  STLDI Plans Exclude or Limit Coverage for Many Serious Health
Conditions and Financially Expose Consumers Who Develop
Unexpected Health Issues. ......................................................................... 17

    C.  Consumers Confused STLDI Plans With Plans That Offer
Comprehensive Coverage. ......................................................................... 20

    D.  Inappropriate Use of STLDI Plans as Long-Term Coverage Creates
Market Instability and Increases Costs for All Consumers. ....................... 22

IV.    The 2024 Rule Strikes the Appropriate Balance between STLDI Plans and ACA-Compliant Comprehensive Plans, Preserves the Intended Purposes of These Different Types of Plans, and Addresses Potential Abuses ..................................... 23

    A.    The 2024 Rule Appropriately Defines STLDI Plans so They Are Short-Term. ...................................................................................................... 23

    B.    Under the 2024 Rule, STLDI Plans Remain Available to Consumers in Appropriate Circumstances and Will Not Drive Lapses in Coverage. ................. 24

    C.    The 2024 Rule Appropriately Requires Notice to Consumers That Will Help Them Make Informed Choices...................................................... 26

    D.    The 2024 Rule Preserves the Stability of the ACA Marketplace.......................... 27

CONCLUSION.................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

42 U.S.C. § 300 gg-91(b)(5) ................................................................................4

42 U.S.C. § 300gg-1(a) .............................................................................11, 24

42 U.S.C. § 300gg-18(b)(1)(A)(ii) .......................................................................13

*Affordable Care Act* .................................................................................... *passim*

*Affordable Care Act 101* .................................................................................13

**Other Authorities**

81 Fed. Reg.75316, 75317 (Oct. 31, 2016).........................................................16

83 Fed. Reg. 7437, 7443 (Feb. 21, 2018) ...........................................................16

83 Fed. Reg. 38212 .........................................................................................23

83 Fed. Reg. 38212, 38214-15 (Aug. 3, 2018) ........................................... *passim*

83 Fed. Reg. 38212, 38214-38215 (Aug. 3, 2018) ..................................................5

83 Fed. Reg. at 38213 ................................................................................16, 17

83 Fed. Reg. at 38214-15 .................................................................................16

88 Fed. Reg. 44596 at 44614 (July 12, 2023).......................................................26

89 Fed. Reg. 23338 (Apr. 3, 2024) ......................................................................1

89 Fed. Reg. 23338 .........................................................................................26

89 Fed. Reg. 23338, 23352 (Apr. 3, 2024) ............................................................5

89 Fed. Reg. at 23340 .....................................................................................24

89 Fed. Reg. at 23351 .....................................................................................22

89 Fed. Reg. at 23361-23362 ............................................................................25

89 Fed. Reg. at 23365-23366 (April 3, 2024).......................................................20

89 Fed. Reg. at 23368 .....................................................................................27

89 Fed. Reg. at 23368-23374 ...................................................................................26, 27

89 Fed. Reg. at 23392 (April 4, 2024) ................................................................................17

29 C.F.R. § 2590.701-2 § 54.9801-2, 45 C.F.R. §144.103 ...............................23, 25, 26

*About Arthritis*, Arthritis Foundation, https://www.arthritis.org/about-arthritis ............................8

*About MS*, National Multiple Sclerosis Society,
    https://www.nationalmssociety.org/understanding-ms/what-is-ms/who-gets-
    ms...............................................................................................................................19

*About MS*, National Multiple Sclerosis Society,
    https://www.nationalmssociety.org/understanding-ms/what-is-ms/who-gets-
    ms =22696...................................................................................................................10

ALS News Today (Jun. 17, 2024) https://alsnewstoday.com/health-insurance-
    financial-resourcesals/#:~:text=In%20the%20U.S.%2C%20
    assistance%20programs,additional%20financial%20support%2C%20includin
    g%20Medicaid ..............................................................................................................9

*ALS Risk Factors*, ALS Association, https://www.als.org/research/als-research-
    topics/als-risk-factors ..................................................................................................8

Am. Cancer Soc'y Cancer Action Network, *A National Poll: Facing Cancer in
    the Health Care System* at 17 (2017),
    https://www.fightcancer.org/sites/default/files/National%20Documents/ACS_
    CANPolling_Report_7.27.10.pdf ................................................................................9

American Cancer Society, *Cancer Facts & Figures 2024* (2024),
    https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-
    statistics/annual-cancer-facts-and-figures/2024/2024-cancer-facts-and-figures-
    acs.pdf .........................................................................................................................8

Andrew P. Wilper et al., *Health Insurance And Mortality in US Adults* ........................................9

Aparna Soni et al., *How Have ACA Insurance Expansions Affected Health
    Outcomes? Findings from the Literature, Health Affairs* (Mar. 2020),
    https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2019.01436........................15

CMS Press Release, December 4, 2024, https://www.cms.gov/newsroom/press-
    releases/nearly-988000-new-consumers-selected-affordable-health-coverage-
    aca-marketplace-so-far.................................................................................................14

*Cost and Financial Burden Survey*, Cystic Fibrosis Foundation (Dec. 9, 2024),
    https://www.cff.org/news/2024-12/survey-health-care-costs-burden.......................10

Cox, C., & Ortaliza, J., *Where ACA Marketplace Enrollment is Growing the Fastest, and Why* (May 16, 2024), https://www.kff.org/policy-watch/where-aca-marketplace-enrollment-is-growing-the-fastest-and-why/ ................................................14

Dane Hansen and Gabriella Dieguez, *The impact on short-term limited-duration policy expansion on patients and the ACA individual market* (Feb. 2020), https://www.milliman.com/en/insight/the-impact-of-short-term-limited-duration-policy-expansion-on-patients-and-the-aca-individual-market ................................23

Daniel M. Hartung, *Economics and Cost-Effectiveness of Multiple Sclerosis Therapies in the USA* ................................................................................................10

Dong Ding and Sherry Glied, *Tightening the Rules Around Short-Term Health Insurance Plans Won't Lead to More People Going Without Insurance* (Oct. 5, 2023), https://www.commonwealthfund.org/blog/2023/tightening-rules-around-short-term-health-insurance-plans-wont-lead-more-people-going ............................17

*Explaining Health Care Reform: Questions About Health Insurance Subsidies*, KFF (Oct. 25, 2024), https://www.kff.org/affordable-care-act/issue-brief/explaining-health-care-reform-questions-about-health-insurance-subsidies/ ...............................................................................................................13, 19

Fact Sheet, CMS.gov (Mar. 28, 2024), https://www.cms.gov/newsroom/fact-sheets/short-term-limited-duration-insurance-and-independent-noncoordinated-excepted-benefits-coverage-cms ................................................17

*Facts & Statistics About Epilepsy*, Epilepsy Foundation, https://www.epilepsy.com/what-is-epilepsy/statistics ..............................................8

Gabriella Dieguez et al., *The cost burden of blood cancer care* ....................................9

*Get Healthcare*, Commonwealth Fund (Aug. 2017), https://www.commonwealthfund.org/sites/default/files/documents/___media_files_publications_issue_brief_2017_aug_gunja_women_hlt_coverage_care_biennial.pdf ................................................................................................12

*Health Insurance Market Reforms*, CMS.gov, https://www.cms.gov/marketplace/health-plans-issuers/insurance-market-reforms ...............................................................................................................13

HHS (Feb. 2024), https://aspe.hhs.gov/sites/default/files/documents/e497c623e5a0216b31291cd37063df1d/NHIS-Q3-2023-Data-Point-FINAL.pdf ..............................................14

*The Perfect Storm: Misleading Marketing of Limited Benefit Products Continues as Millions Losing Medicaid Search for New Coverage*, T University McCourt School of Public Policy (Aug. 2023) at 5, https://georgetown.app.box.com/v/the-perfect-storm-august-2023 ..........................21

https://www.milliman.com/-/media/milliman/pdfs/articles/stld-impact-report_20200219.ashx?la=en&hash=EE2BA0088DA4B0B5D404E6C1946115FC ........................................27

*Individual Health Insurance*, Robert Wood Johnson Foundation (Aug. 2018), https://www.rwjf.org/en/insights/our-research/2018/08/views-from-the-market.html ........................................................................22

*Individuals and Families*, KFF (Oct. 4, 2019), https://www.kff.org/affordable-care-act/issue-brief/pre-existing-condition-prevalence-for-individuals-and-families/........................................................................11

*Industry Practices and State Regulatory Responses*, UrbanInstitute(2019), https://www.urban.org/sites/default/files/publication/99708/moni_stldi_final_0.pdf ........................................................................21

Kaiser Family Foundation et al., *National Survey of Households Affected by Cancer* (November 2006), https://www.kff.org/wp-content/uploads/2013/01/7591.pdf........................................12

KFF (May 28, 2024), https://www.kff.org/health-policy-101-the-affordable-care-act/?entry=table-of-contents-what-is-the-affordable-care-act ........................13

Leukemia & Lymphoma Society, Comment Letter on Short-Term, Limited-Duration Insurance Proposed Rule (Sep. 11, 2023), https://www.regulations.gov/comment/CMS-2023-0116-13372 ...........................22

*Marketplace Enrollment, 2014-2024, KKF*, https://www.kff.org/affordable-care-act/state-indicator/marketplace-enrollment/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D; .......................................14

*Medical Management of Epilepsy, Johns Hopkins*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/epilepsy/medical-management-of-epilepsy ........................10

Medical Underwriting, HealthCare.Gov, https://www.healthcare.gov/glossary/medicalunderwriting/#:~: ........................................18

Milliman (Oct. 2018), https://www.lls.org/sites/default/files/Milliman%20study%20cost%20burden%20of%20blood%20cancer%20care.pdf........................................9

*Most US Families,* Commonwealth Fund (July 2009) https://www.commonwealthfund.org/sites/default/files/documents/___media_files_publications_issue_brief_2009_jul_failure_to_protect_1300_doty_failure_to_protect_individual_ins_market_ib_v2.pdf ........................................11

*MS Prevalence*, National MS Society, https://www.national mssociety.org ...................................8

*Multiple Sclerosis*, National Multiple Sclerosis Society,
     https://www.nationalmssociety.org/managing-ms/treating-ms/disease-
     modifying-therapies/cost-of-ms ..................................................................................9

National Institute of Health https://magazine.
     medlineplus.gov/article/autoimmune-diseases-what-you-need-to-know ................................8

*Number*s, National Alliance on Mental Illness, https://www.nami.org/about-
     mental-illness/mental-health-by-the-numbers/ ...........................................................8

*Prescription Drugs, and None Cover Maternity Care*, KFF (Apr. 23, 2018),
     https://www.kff.org/affordable-care-act/press-release/analysis-most-short-
     term-health-plans-dont-cover-drug-treatment-or-prescription-drugs-and-none-
     cover-maternity-care/ .................................................................................................18

*Products Are Leaving Patients Exposed*, LLS (Mar. 2021),
     https://www.lls.org/sites/default/files/National/undercovered_report.pdf............................19

Rachel Schwab and JoAnn Volk, *The Perfect Storm: Misleading Marketing of
     Limited Benefit Products Continues as Millions Losing Medicaid Search for
     New Coverage* ..........................................................................................................21

Report on Testing Consumer Understanding of a Short-Term Health Insurance
     Plan, Nat'l Ass'n of Ins. Comm'rs 1, 2 (Mar. 15, 2019),
     https://healthyfuturega.org/wp-content/uploads/2019/04/Consumer-Testing-
     Report_NAIC-Consumer-Reps.pdf ...............................................................................18

*Risk*, Commonwealth Fund (Oct. 30, 2018),
     https://www.commonwealthfund.org/blog/2018/short-term-health-plan-gaps-
     and-limits-leave-people-risk ........................................................................................16

*Selected Offerings*, GAO (Aug. 24, 2020), https://www.gao.gov/products/gao-20-
     634r ............................................................................................................................20

*Selected Offering*s. Government Accountability Office (August 2020),
     https://www.gao.gov/products/gao-20-634r; ................................................................21

*Shot-Term Health Plans*, Robert Wood Johnson Foundation (Jan. 31, 2019),
     https://www.rwjf.org/en/insights/our-research/2019/01/the-marketing-of-
     short-term-health-plans.html.........................................................................................21

*States Pre and Post ARP*, April 2021,https://aspe.hhs.gov/reports/count-estimates-
     zero-low-premium-plan-availability-healthcaregov-states-pre-post-arp ...........................12

Susie Strachan, *Insurance and financial resources for ALS treatment* ...........................................9

*Uncertain Future*, J. Surgical Research (July 2021), https://www.journalofsurgicalresearch.com/article/S0022-4804(21)00016-0/fulltext ................................................................................................15

*Understanding ALS*, ALS Association, https://www.als.org/understanding-als#:~:text=Most%20people%20who%20develop%20ALS,common%20in%20men%20than%20women ............................................19

*Understanding Short-Term Limited Duration Health Insurance*, KFF (Apr. 23, 2018), https://www.kff.org/affordable-care-act/issue-brief/understanding-short-term-limited-duration-health-insurance/ ................................................17, 18

*Understanding Short-Term Limited Duration Health Insurance*, KFF (Apr. 23, 2018) https://www.kff.org/affordable-care-act/issue-brief/understanding-short-term-limited-duration-health-insurance/; ............................................19

*Understanding Special Enrollment Periods*, Center for Medicare & Medicaid Services, https://www.cms.gov/marketplace/outreach-and-education/special-enrollment-periods-available-to-consumers.pdf ......................................14

*United States*, National Center for Health Statistics (Apr. 2023), https://www.cdc.gov/nchs/data/series/sr_02/sr02-201.pdf ......................................19

*Unscrupulous and Partnership to Protect Coverage, Under-Covered: How "Insurance-Like" Products are Leaving Patients Exposed*, https://www.lls.org/sites/default/files/National/undercovered_report.pdf.; ............................21

*The Wall Street Journal* (Apr. 10, 2016), available at: https://www.wsj.com/articles/sales-of-short-term-health-policies-surge-1460328539 ..........................................................................16

*Who Can Get Epilepsy*, Epilepsy Foundation, https://www.epilepsy.com/what-is-epilepsy/understanding-seizures/who-gets-epilepsy; ............................................8

Yabroff, K. R., et al., *Association of Medical Financial Hardship and Mortality Among Cancer Survivors in the United States* ......................................9, 10

## INTEREST OF AMICI CURIAE[1]

The Leukemia & Lymphoma Society ("LLS"), the AIDS Institute, ALS Association, Arthritis Foundation, Cancer*Care*, Cancer Support Community ("CSC"), Crohn's & Colitis Foundation, Cystic Fibrosis Foundation ("CFF"), Epilepsy Foundation of America ("EFA"), Families USA, Muscular Dystrophy Association ("MDA"), National Alliance on Mental Illness ("NAMI"), National Multiple Sclerosis Society ("NMSS"), National Organization for Rare Disorders (NORD), and National Patient Advocate Foundation ("NPAF") (collectively "Amici") represent millions of patients and consumers across the country facing serious, acute, and chronic health conditions. A number of Amici participated in the underlying rulemaking proceeding to amend the federal definition of short-term, limited-duration insurance ("STLDI"). Amici have unique perspectives on what individuals and families need to prevent disease, manage health, and cure illness—including the insurance coverage needs of those who have these serious medical conditions, which often require costly treatment. As a result, Amici have a deep understanding of the harm that will result if the STLDI rule, as amended in the April 2024 Final Rule ("the 2024 Rule"), is vacated. *See* 89 Fed. Reg. 23338 (Apr. 3, 2024).

The LLS is the world's largest voluntary health agency dedicated to fighting blood cancer and ensuring that the more than 1.3 million blood cancer patients and survivors in the United States have access to the care they need. LLS's mission is to cure leukemia, lymphoma, Hodgkin's disease, and myeloma, and to improve the quality of life of patients and their families. LLS advances that mission by advocating that blood cancer patients have sustainable access to quality, affordable, coordinated health care, regardless of the source of their coverage.

---

[1] All parties have consented to the filing of this amicus curiae brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of the brief. No person other than amici curiae or their counsel made a monetary contribution to the preparation or submission of this brief.

The AIDS Institute is a leading national nonprofit nonpartisan organization working to increase access to healthcare for people living with and at risk of acquiring HIV and viral hepatitis, to bring an end these epidemics.

The ALS Association is the only national nonprofit organization fighting ALS on every front. The mission of The ALS Association is to discover treatments and a cure for ALS, and to serve, advocate for, and empower people affected by ALS to live their lives to the fullest. By leading the way in global research, providing assistance for people with ALS through a nationwide network of chapters, coordinating multidisciplinary care through certified clinical care centers, and fostering government partnerships, The Association builds hope and enhances quality of life while aggressively searching for new treatments and a cure.

The Arthritis Foundation, the nation's largest nonprofit organization focusing on arthritis, is boldly pursuing a cure for America's #1 cause of disability and championing the fight to conquer arthritis with life-changing science, resources, advocacy and community connections.

The CSC uplifts and strengthens people impacted by cancer by providing support, fostering compassionate communities, and breaking down barriers to care through education, research, and advocacy.

Founded in 1944, Cancer*Care* is the leading national organization providing free, professional support services and information to help people manage the emotional, practical, and financial challenges of cancer.

The CFF's mission is to cure cystic fibrosis and to provide all people with CF the opportunity to lead long, fulfilling lives by funding research and drug development, partnering with the CF community, and advancing high-quality, specialized care. The CFF advocates for policies that promote access to affordable, adequate health care for all people with cystic fibrosis.

The Crohn's & Colitis Foundation is a non-profit, volunteer-fueled organization dedicated to finding cures for Crohn's disease and ulcerative colitis, and improving the quality of life of children and adults affected by these diseases.

The Epilepsy Foundation of America is the leading national voluntary health organization that speaks on behalf of the nearly 3.4 million Americans living with epilepsy and seizures. The mission of the Foundation is to improve the lives of people affected by epilepsy through education, advocacy, research, and connection.

Families USA, a leading national, non-partisan voice for health care consumers, is dedicated to achieving high-quality, affordable health care and improved health for all.

The MDA is the number one voluntary health organization in the United States for people living with muscular dystrophy, ALS, and related neuromuscular diseases. For over 70 years, MDA has led the way in accelerating research, advancing care, and advocating for the support of our families. MDA's mission is to empower the people it serves to live longer, more independent lives.

NAMI is the nation's largest grassroots mental health organization with 49 state organizations and over 650 local affiliates. NAMI provides advocacy, education, support, and public awareness so that all individuals and families affected by mental illness can build better lives.

The NMSS mobilizes people and resources so that everyone affected by multiple sclerosis ("MS") can live their best lives, while also seeking to end MS forever. To fulfill this mission, the NMSS funds more MS research and provides more programs for people with MS and their families than any other voluntary health organization in the world. The NMSS works to ensure that all people with MS have access to affordable high quality health care.

NORD, a 501(c)(3) organization, is a patient advocacy organization dedicated to individuals with rare diseases and the organizations that serve them. NORD, along with its more than 350 patient organization members, is committed to improving the health and well-being of people with rare diseases by driving advances in care, research, and policy.

NAPF's mission is to make the healthcare system work for all of us. The Foundation works at the national level to influence policy and drive change in healthcare.

Amici are all deeply concerned about the effect that vacating the 2024 Rule would have on the individuals and families they represent. If the 2024 Rule is vacated, many people would face more difficulties accessing the medical care they need. Amici submit this brief to assist the court in understanding the nature and extent of this harm.

## INTRODUCTION

Plaintiffs in this case challenge the 2024 Rule as invalid and unenforceable. Among other things, they contend that the 2024 Rule would render STDLI plans useless, expose consumers to lapses in coverage, and eliminate consumer choice. Complaint, ¶¶ 4. To the contrary, the 2024 Rule is designed to protect consumers from inadequate health coverage and facilitate more informed decisions by appropriately limiting the duration of STLDI plans, preventing issuers from stacking STLDI plans, and increasing transparency regarding the limitations of these plans. The 2024 Rule addresses loopholes and issuer abuses that effectively made STLDI plans inaccurately appear to be substitutes for long-term, comprehensive coverage. Indeed, STLDI plans are intended to address temporary gaps in coverage between periods of coverage by other, more comprehensive health insurance policies. Given their short-term, stop-gap nature, these plans are not required to adhere to important minimum standards for commercial health insurance plans set forth in the Patient Protection and Affordable Care Act ("ACA"). *See* 42 U.S.C. § 300 gg-91(b)(5). These

critical standards include, among other things, requirements to cover certain essential health benefits ("EHB"), such as inpatient and outpatient services, lab services, and prescription medications, without lifetime or annual limits; prohibitions on discrimination against people with pre-existing conditions or based on gender or disability; and coverage of certain preventive services, without cost-sharing obligations for the patient.

In the challenged rule, the Departments of Treasury, Labor, and Health and Human Services ("HHS") (collectively, "the Departments") have amended the prior definition of "short-term, limited-duration insurance." 89 Fed. Reg. 23338, 23352 (Apr. 3, 2024). The previous definition allowed STLDI plans to have a duration up to 364 days, permitted enrollees to renew such plans for up to thirty-six months, and allowed these short-term plans to be purchased *seriatim* indefinitely. 83 Fed. Reg. 38212, 38214-38215 (Aug. 3, 2018). As a result, STLDI plans—which often provide limited coverage—essentially served as long-term insurance plans but that fell short of the comprehensive coverage that ACA-compliant plans must provide. The 2024 Rule thus amended the definition of STLDI to align to the pre-2018 definition to more appropriately reflect the intended short-term purpose of these plans and to close a loophole that permitted issuers to offer these plans for extended periods of time without complying with important ACA protections. Specifically, the 2024 Rule defines STLDI plans as those that have an expiration date no more than three months after the original effective date of the policy. Additionally the 2024 Rule prohibits STLDI sponsors from "stacking plans" – a practice in which STLDI sponsors would sell to consumers separate, sequential STLDI plans, bypassing the duration limits for SLTDI plans altogether.

Additionally, the 2024 Rule amended the existing STLDI notice to further clarify for consumers, in concise, understandable language, the differences between STLDI and

comprehensive coverage and to help consumers identify options for obtaining comprehensive coverage. Because the prior rule effectively allowed consumers to enroll in these non-ACA plans indefinitely, STLDI consumers have had long-term, limited coverage that contravene ACA protections and may not cover the cost of care to treat the diseases on which Amici are focused. As evidenced by the studies described herein, consumers also have been susceptible to misunderstanding the coverage limitations of these policies, as well as to fraudulent and abusive conduct at the hands of unscrupulous insurance brokers. Changes to the STLDI definition and notice requirements in the 2024 Rule are intended to address these harmful practices and effectively prevent these plans from serving as purported but inadequate replacements for the generally accessible and comprehensive plans that comply with the ACA's requirements.

In addition, the 2018 Rule had harmful effects on the insurance market that the 2024 Rule seeks to rectify. When healthier consumers flee ACA-compliant plans for seriatim STLDI plans, those enrolled in ACA-compliant plans suffer downstream effects. These include higher premiums and, in some circumstances, an inability to access coverage at all due to either prohibitive premium costs or the exit of insurance issuers that may otherwise sponsor ACA-compliant plans but for the financial risk associated with such unbalanced risk pools.

Amici agrees with defendants that the 2024 Rule was promulgated within the Departments' authority and is not arbitrary and capricious. *See* Defendant's Cross-Motion for Summary Judgment at 14-29. In this brief, however, Amici highlight the harms that are all but certain to follow if the 2024 Rule is not allowed to stand. *See id.* at 1 (discussing "mounting evidence of consumer confusion, exacerbated by aggressive or deceptive marketing practices"), 10-11 (stating that "consumers could find themselves being hit with unexpected medical bills and exorbitant out-of-pocket maximums because they were unaware of their STLDI plan's coverage limits and its

absence of Federal consumer protections"). As detailed below, the availability of affordable, accessible, and adequate health insurance is critical to health outcomes.

The 2024 Rule strikes the appropriate balance of retaining access to STLDI plans for transitional periods between having comprehensive coverage, while mitigating the risk that consumers will purchase inadequate plans based on a misunderstanding that STLDI plans are a sufficient replacement for ACA-compliant, comprehensive coverage. As a result, more consumers will make the informed decision to enroll in meaningful and comprehensive health insurance coverage, as intended by the ACA, increasing patients' affordable access to critical treatments if and when they are needed. If the 2024 Rule is vacated, reversion to the 2018 policies regarding STLDI plans poses a very real threat to the health and financial security of many millions of Americans.

## ARGUMENT

### I.    Adequate Insurance Is Critical To Health Outcomes.

Nearly everyone will require treatment to address health conditions at some point in their lives.[2]  Research shows that comprehensive insurance coverage, like an ACA-compliant plan, improves health outcomes and reduces the risk of financial loss incurred because of expensive treatments that are not covered by insurance. Even when considering only those disease states on which Amici focus, it is clear that most Americans are directly or indirectly impacted by serious health concerns, which often require expensive treatment.

---

[2] See Nat'l Fed. of Indep. Bus. v. Sebelius, 567 U.S. 519, 547 (2012).

For example, an estimated two million Americans will be diagnosed with cancer in 2024.[3] Four out of ten Americans will develop cancer in their lifetimes.[4]  There are approximately 1,680 deaths from cancer every day in the United States.[5]  Twenty-three and a half million Americans suffer from autoimmune diseases, including one million with MS.[6]  Another thirty thousand Americans are living with ALS.[7]  Almost three and half million people in the United States live with epilepsy, with around one million of these cases being uncontrolled epilepsy.[8]  Sixty million Americans have arthritis; more than half of adults who suffer from arthritis are working age.[9]

Additionally, the United States is in the midst of an unprecedented crisis of mental health, with over twenty-two percent of adults experiencing mental illness in 2021.[10] Yet, less than half of U.S. adults with mental illness received treatment in that year.[11]  Experiencing mental illness can worsen other health outcomes, including increasing risks of cardiovascular and metabolic diseases and substance use disorders.[12]

The cost to treat these diseases without health insurance can be prohibitive for most Americans.  The average cost associated with leukemia treatment was $200,000 for chronic

---

[3] American Cancer Society, *Cancer Facts & Figures 2024* at 1 (2024), https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-statistics/annual-cancer-facts-and-figures/2024/2024-cancer-facts-and-figures-acs.pdf.

[4] *Id.* at 2.

[5] *Id.* at 1.

[6] *Autoimmune diseases: What you need to know,* National Institute of Health https://magazine.medlineplus.gov/article/autoimmune-diseases-what-you-need-to-know ; M*S Prevalence*, National MS Society, https://www.national mssociety.org /About-the-Society/MS-Prevalence.

[7] *ALS Risk Factors*, ALS Association, https://www.als.org/research/als-research-topics/als-risk-factors.

[8] *Who Can Get Epilepsy*, Epilepsy Foundation, https://www.epilepsy.com/what-is-epilepsy/understanding-seizures/who-gets-epilepsy; *Facts & Statistics About Epilepsy*, Epilepsy Foundation, https://www.epilepsy.com/what-is-epilepsy/statistics.

[9] *About Arthritis*, Arthritis Foundation, https://www.arthritis.org/about-arthritis.

[10] *Mental Health by the Number*s, National Alliance on Mental Illness, https://www.nami.org/about-mental-illness/mental-health-by-the-numbers/.

[11] *Id.*

[12] *Id.*

leukemia and $800,000 for acute leukemia.[13]  MS treatments cost on average between $57,000-$92,000 per year.[14]  Patients with ALS can pay anywhere from $80,000 to $250,000 per year for care.[15]  Among cancer survivors aged 18-65, twenty-nine percent reported financial hardships within the past 12 months.[16]

Unsurprisingly, health outcomes drastically improve when individuals have access to healthcare due to comprehensive and robust health insurance.  A study found that approximately forty-five thousand deaths annually could be attributed to the lack of health insurance among working-age Americans.[17]  These uninsured individuals had a forty percent higher risk of death than their privately insured counterparts.[18]

The increased risks associated with inadequate health insurance stem from a variety of factors.  For cancer patients, early detection and treatment is key. But an American Cancer Society Cancer Action Network poll conducted before passage of the ACA found that thirty-four percent of individuals under the age of sixty-five with cancer or a history of cancer had delayed care because of cost in the preceding twelve months.[19]  Another study observed that uninsured females are twice as likely as insured females, and uninsured males are one and a half times as likely as

---

[13] Gabriella Dieguez et al., *The cost burden of blood cancer care*, Milliman (Oct. 2018), https://www.lls.org/sites/default/files/Milliman%20study%20cost%20burden%20of%20blood%20cancer%20care.pdf.

[14] *Cost of Multiple Sclerosis*, National Multiple Sclerosis Society, https://www.nationalmssociety.org/managing-ms/treating-ms/disease-modifying-therapies/cost-of-ms.

[15] Susie Strachan, *Insurance and financial resources for ALS treatment*, ALS News Today (Jun. 17, 2024) https://alsnewstoday.com/health-insurance-financial-resourcesals/#:~:text=In%20the%20U.S.%2C%20 assistance%20programs,additional%20financial%20support%2C%20including%20Medicaid.

[16] Yabroff, K. R., et al., *Association of Medical Financial Hardship and Mortality Among Cancer Survivors in the United States*, 114 Journal of the National Cancer Institute Issue 6, 863 (Jun. 13, 2022).

[17] Andrew P. Wilper et al., *Health Insurance And Mortality in US Adults*, 99 Am. J. Pub. Health 2289, 2292 (2009).

[18] *Id.*

[19] Am. Cancer Soc'y Cancer Action Network, *A National Poll: Facing Cancer in the Health Care System* at 17 (2017), https://www.fightcancer.org/sites/default/files/National%20Documents/ACS_CANPolling_Report_7.27.10.pdf.

insured males, to be diagnosed with cancer that has already metastasized.[20]  Cancer patients who experience financial hardship have a higher adjusted mortality risk.[21]  For people with cystic fibrosis, a chronic progressive disease, both cost and coverage can be barriers to care.  Though 96 percent of people with CF have health insurance coverage for the entire year, over a third delayed at least one aspect of their necessary care due to cost.  Of those that delayed, the copays and insurance denials were the top two reasons for a gap in access.[22]

Individuals with chronic diseases like MS and epilepsy likewise experience improved outcomes when they have access to adequate insurance.  Most people with MS are diagnosed between the ages of twenty and fifty, and early treatment is critical.[23]  MS patients face a reduction in survival of between eight to twelve years if they do not receive proper treatment, but few can afford the more than $88,000 average annual cost of such treatment without health insurance.[24]  Likewise, seventy percent of epilepsy patients can control their seizures with the correct medication and surgical intervention.[25]

---

[20] Anthony Robbins et al., Insurance Status and Distant-Stage Disease at Diagnosis Among Adolescent and Young Adult Patients with Cancer Aged 15 to 39 Years: National Cancer Data Base, 2004 Through 2010, 120 CANCER 1212, 1214 (2014).

[21] Yabroff, K. R., et al., *Association of Medical Financial Hardship and Mortality Among Cancer Survivors in the United States*, 114 Journal of the National Cancer Institute Issue 6, 863.

[22] *Cystic fibrosis Outcomes, Social factors, Tradeoffs due to Cost and Financial Burden Survey*, Cystic Fibrosis Foundation (Dec. 9, 2024), https://www.cff.org/news/2024-12/survey-health-care-costs-burden.

[23] *About MS*, National Multiple Sclerosis Society, https://www.nationalmssociety.org/understanding-ms/what-is-ms/who-gets-ms =22696.

[24] *Id.*; *see* Daniel M. Hartung, *Economics and Cost-Effectiveness of Multiple Sclerosis Therapies in the USA*, 14:4 Neurotherapeutics 1018 (2017).

[25] *Medical Management of Epilepsy, Johns Hopkins*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/epilepsy/medical-management-of-epilepsy.

## II.    The ACA Ensures Greater Access to Comprehensive Health Care Coverage and has Led to Significant Decreases in the Percentage of Americans Who are Uninsured.

To give context to the key rationale for the 2024 Rule's amendments to the definition of STLDI plans, it is important to describe the ACA's requirements for comprehensive health care insurance.  The ACA helped to enshrine American's access to affordable, comprehensive commercial health insurance, leading to improved health outcomes.  The ACA required commercial insurance to cover pre-existing conditions and certain EHBs, created marketplaces to expand access to, and information regarding, health insurance options, and reduced costs.  The 2024 Rule aligned the requirements for STDLI plans with the intent and purpose of the ACA.

### A.    The ACA Prohibits Health Insurers From Engaging in Various Forms of Discrimination.

Prior to the ACA, health insurers often denied insurance coverage for individuals with pre-existing health conditions or charged them higher premiums.[26]  At that time, health insurers would deny coverage for pre-existing conditions such as diabetes, obesity, mental illness, and pregnancy or becoming pregnant in the future.[27]  The ACA, however, now prohibits insurers in the individual and group markets from denying coverage based on pre-existing conditions, guaranteeing that the most vulnerable populations, who often need care the most, can purchase health insurance. 42 U.S.C. § 300gg-1(a).  Further, the ACA prohibits such insurers from charging individuals with preexisting conditions or women more for their premiums, limiting premium variation based only on certain criteria (e.g., age, geographic location, and tobacco use). *Id.*  The ACA also prohibits health insurers that receive Federal financial assistance (including premium subsidies) and health

---

[26] M. M. Doty et al., *Failure to Protect: Why the Individual Insurance Market is not a Viable Option for Most US Families,* Commonwealth Fund (July 2009) https://www.commonwealthfund.org/sites/default/files/documents/__media_files_publications_issue_brief_2009_jul_failure_to_protect_1300_doty_failure_to_protect_individual_ins_market_ib_v2.pdf.

[27] Gary Claxton, et al., *Pre-Existing Condition Prevalence for Individuals and Families*, KFF (Oct. 4, 2019), https://www.kff.org/affordable-care-act/issue-brief/pre-existing-condition-prevalence-for-individuals-and-families/.

insurance Marketplaces from discriminating on the basis of race, color, national origin, sex, age or disability. *Id.* at § 18116 (a).

**B.    The ACA Requires the Provision of Essential Health Benefits.**

The ACA requires that individual and group commercial insurance plans provide 10 categories of EHBs to their enrollees.  *Id.* at § 300gg-6(a).  Benefits covered under this provision include preventative and wellness services, maternity and newborn care, inpatient and outpatient care, and prescription drugs. *Id.* at . § 18022(a)-(b).  Such health insurers cannot impose any lifetime or annual benefit limits on coverage for these EHBs. *Id.* at §§ 18022(c), (d).  Prior to the passage of the ACA, an estimated one in ten cancer patients reported reaching their lifetime benefit limits, leaving them uninsured for the rest of their illness.[28]  In addition, prior to the passage of the ACA, many plans did not provide any coverage for certain EHBs.  For example, only thirteen percent of plans in the individual market prior to the ACA covered maternity care.[29]

**C.    Comprehensive Health Coverage and Care Are More Affordable as a Result of the ACA.**

The ACA made it both easier and more affordable for individuals to obtain comprehensive coverage and care.  The enhanced premium tax credits have made the Marketplace plans affordable and even free for millions of Americans.[30]  The ACA provides a sliding scale for the premium tax

---

[28] Kaiser Family Foundation et al., *National Survey of Households Affected by Cancer* (November 2006), https://www.kff.org/wp-content/uploads/2013/01/7591.pdf.

[29] Munira Z. Gunja et al., *How the Affordable Care Act Has Improved Women Gain Insurance and Improved Their Ability to Get Healthcare*, Commonwealth Fund (Aug. 2017), https://www.commonwealthfund.org/sites/default/files/documents/___media_files_publications_issue_brief_2017_aug_gunja_women_hlt_coverage_care_bien nial.pdf

[30] *Count Estimates of Zero and Low Premium Plan Availability, HealthCare.gov States Pre and Post ARP*, April 2021, https://aspe.hhs.gov/reports/count-estimates-zero-low-premium-plan-availability-healthcaregov-states-pre-post-arp.

credits; individuals and families who are under four hundred percent of the federal poverty level receive some tax credit, and the lower the income the greater the tax credit.[31]

**D.    Health Plans Must Now Pay a Greater Share of Health Care Costs.**

The ACA required health plans to spend more money to pay for the cost of members' care. The medical loss ratio requirement mandates that health insurers provide rebates to consumers if the plan sponsors do not spend enough of the premium revenue on clinical services and quality improvement, limiting both the permissible expenditures on administrative costs and profits.[32] ACA-compliant plans must spend at least eighty percent of the revenue generated from premiums on healthcare costs.  42 U.S.C. § 300gg-18(b)(1)(A)(ii).  By contrast, in 2020, a Congressional committee investigation found that STLDI plans only spent forty-eight percent of the premium revenue on healthcare claims and medical benefits for consumers.[33] The rest of STLDI plans' revenue went to either administrative expenses or profit.

**E.    Healthcare Marketplaces Throughout the U.S. and Special Enrollment Periods Created Under the ACA Make Healthcare More Accessible.**

The ACA also established healthcare Marketplaces, which have been one of the ACA's most significant impacts to the U.S. healthcare system. The ACA created fifty different Marketplaces for each state, with the plans offered unique to the state.[34]  Each of these Marketplaces contain several types of plans and allow consumers to choose the right plan for them

---

[31] *Explaining Health Care Reform: Questions About Health Insurance Subsidies*, KFF (Oct. 25, 2024), https://www.kff.org/affordable-care-act/issue-brief/explaining-health-care-reform-questions-about-health-insurance-subsidies/.

[32] *Health Insurance Market Reforms*, CMS.gov, https://www.cms.gov/marketplace/health-plans-issuers/insurance-market-reforms.

[33] Staff on H. Comm. On Energy & Commerce, 116th Cong., Shortchanged: How the Trump Administration's Expansion of Junk Short-Term Health Insurance Plans is Putting American at Risk at 48 (Comm. Print June 2020).

[34] *The Affordable Care Act 101*, KFF (May 28, 2024), https://www.kff.org/health-policy-101-the-affordable-care-act/?entry=table-of-contents-what-is-the-affordable-care-act.

in an easy and convenient manner online.  Since the passage of the ACA, the number of people enrolled in a Marketplace plan has soared to the highest number ever in 2024.  Growth in utilization of these Marketplaces can be attributed, in part, to enhanced subsidies made available to consumers, which have "significantly reduced premium payments across the board for ACA Marketplace enrollees – including providing 100% premium subsidies for the lowest-income enrollees – and made some middle-income people who had previously been priced out of coverage newly eligible for financial assistance."[35]  Over twenty-one million people are enrolled in Marketplace plans for their health insurance coverage for 2024, and nearly 988,000 new consumers are projected to select one of these plans for 2025.[36]  Conversely, the rate of Americans without health insurance has declined significantly.  Before Congress passed the ACA, the uninsured rate in the United States was sixteen percent.[37]  In 2023, due to the changes implemented under the ACA, the rate fell to an all-time low of 7.7%.  *Id.*

Finally, the special enrollment periods created by the ACA make it easier for Americans to enroll in or switch health insurance coverage whenever they have a major life event.[38]  If a consumer has changed their primary residence, lost their previous health insurance, or has married or had a child, they can sign up for a plan on the individual marketplace outside of the normal open enrollment period, allowing for greater flexibility and security of health care coverage.  *Id.*

---

[35] Cox, C., & Ortaliza, J., *Where ACA Marketplace Enrollment is Growing the Fastest, and Why*, (May 16, 2024), https://www.kff.org/policy-watch/where-aca-marketplace-enrollment-is-growing-the-fastest-and-why/.

[36] *Marketplace Enrollment, 2014-2024, KKF*, https://www.kff.org/affordable-care-act/state-indicator/marketplace-enrollment/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D; CMS Press Release, December 4, 2024, https://www.cms.gov/newsroom/press-releases/nearly-988000-new-consumers-selected-affordable-health-coverage-aca-marketplace-so-far.

[37] *National Uninsured Rate Remains Largely Unchanged at 7.7 Percent in the Third Quarter of 2023*, HHS (Feb. 2024), https://aspe.hhs.gov/sites/default/files/documents/e497c623e5a0216b31291cd37063df1d/NHIS-Q3-2023-Data-Point-FINAL.pdf.

[38] *Understanding Special Enrollment Periods*, Center for Medicare & Medicaid Services, https://www.cms.gov/marketplace/outreach-and-education/special-enrollment-periods-available-to-consumers.pdf.

The reforms passed through the ACA have created long-lasting and tangible increases in health outcomes for Americans.  For example, studies show that the ACA has improved healthcare access for surgical populations.  Following the ACA's implementation, surgical patients presented to care centers earlier for acute surgical diseases such as appendicitis and colon cancer perforation, resulting in better outcomes.[39]  Researchers also found that the ACA's expansions of insurance coverage increased early-stage cancer diagnosis and improved cardiovascular health.[40]  Some studies have even demonstrated that the ACA lowered mortality rates for certain populations.[41]  Taken together, the changes implemented by the ACA have not only expanded access to comprehensive healthcare coverage and decreased the uninsured population by over fifty percent, but also have had a positive effect on health outcomes.

### III.    Lack of Time Limitations and Insufficient Notices on STLDI Plans Prior to the 2024 Rule Exposed Consumers to Significant Gaps in Coverage and High Costs of Care Not Covered by STLDI Plans.

### A.    STLDI Plans Are Intended to Provide Short-Term, Stop-Gap Coverage.

Under the 2018 Rule, STDLI plans departed from their intended purpose to provide short-term coverage and turned into long-term plans that provide limited coverage, effectively evading the ACA's statutory requirements and objectives.  Short-Term, Limited-Duration Insurance, 83 Fed. Reg. 38212, 38214-15 (Aug. 3, 2018) ("2018 Rule").  Indeed, the plain meaning of "short-term, limited-duration insurance" is apparent from its name.

---

[39] Pooja U. Neiman et al., *The Affordable Care Act at 10 Years: Evaluating the Evidence and Navigating an Uncertain Future*, J. Surgical Research (July 2021), https://www.journalofsurgicalresearch.com/article/S0022-4804(21)00016-0/fulltext.

[40] Aparna Soni et al., *How Have ACA Insurance Expansions Affected Health Outcomes? Findings from the Literature*, Health Affairs (Mar. 2020), https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2019.01436.

[41] *Id.*

These plans were intended and designed as stop-gap, transitional insurance used only for a brief period, as even the 2018 Rule recognized. Proposed Rule, Short-Term, Limited Duration Insurance, 83 Fed. Reg. 7437, 7443 (Feb. 21, 2018) ("Short-term, limited duration insurance is a type of health insurance coverage that was designed to fill temporary gaps in coverage that may occur when an individual is transitioning from one plan or coverage to another plan or coverage"). Because STLDI plans were exempted from the requirements imposed by the ACA, they are not required to provide individuals with the ACA protections described in Section II. Issuers of STLDI plans therefore do not cover many routine and essential medical services, impose limits on the total amount of services that they do cover, and refuse to issue these plans to many patients (especially those with preexisting conditions).[42]

Before 2018, STLDI plans could only provide a patient with insurance coverage for up to three months. 2018 Rule, 83 Fed. Reg. at 38213. In 2016, the Departments noted that they established the three-month duration rule out of concern that issuers were selling STLDI plans in situations other than as transitional coverage, as the ACA's exception for STLDI plans had intended. Short-Term, Limited-Duration Insurance 81 Fed. Reg.75316, 75317 (Oct. 31, 2016)("2016 Rule").[43]

However, the 2018 Rule dramatically changed the definition of STLDI plans. Under that rule, STLDI plans were no longer restricted to three-month terms. Instead, insurers could sell these plans for periods of 364 days with the potential to renew *for a total of three years*. 2018 Rule, 83 Fed. Reg. at 38214-15. STLDI sponsors could also "stack" plans, meaning they would provide

---

[42] Dania Palanker, JoAnn Volk, and Kevin Lucia, *Short-Term Health Plan Gaps and Limits Leave People at Risk*, Commonwealth Fund (Oct. 30, 2018), https://www.commonwealthfund.org/blog/2018/short-term-health-plan-gaps-and-limits-leave-people-risk.

[43] Citing Anna W. Matthews, *''Sales of Short-Term Health Policies Surge,''* The Wall Street Journal (Apr. 10, 2016), available at: https://www.wsj.com/articles/sales-of-short-term-health-policies-surge-1460328539.

consumers with separate, sequential STLDI policies, allowing them to completely avoid the duration limits on STLDI plans.[44]  The Departments' rationale for the 2018 change was that the expansion of these plans could help lower the number of uninsured individuals by providing a lower-cost option. 2018 Rule, 83 Fed. Reg. at 38213.  However, the percentage of uninsured individuals did not decrease.  Instead, individuals began switching from plans with more comprehensive coverage under the ACA to STLDI plans that, in many cases unwittingly, exposed these patients to inadequate coverage and high costs.[45]  An estimated three million people were enrolled in STLDI plans in 2019—a twenty-seven percent increase—only one year after the 2018 Rule fostered the proliferation of STLDI plans.[46]

**B.     STLDI Plans Exclude or Limit Coverage for Many Serious Health Conditions and Financially Expose Consumers Who Develop Unexpected Health Issues.**

For several reasons, STLDI plans do not provide comprehensive health coverage to their members and lack important protections, leaving these patients without sufficient coverage for their health issues.[47]  First, these plans use medical underwriting and, through this process, often deny coverage or charge higher premiums to individuals based on their health status, gender, age, and other factors.  Medical underwriting is a process used by insurance companies to determine a consumer's health status when they are applying for health insurance coverage in order to decide whether coverage will be offered, the price of the coverage, and whether exclusions or limits

---

[44] Short-Term, Limited Duration Insurance and Independent, Noncoordinated Excepted Benefits Coverage (CMS-9904-F) Fact Sheet, CMS.gov (Mar. 28, 2024), https://www.cms.gov/newsroom/fact-sheets/short-term-limited-duration-insurance-and-independent-noncoordinated-excepted-benefits-coverage-cms.

[45] Dong Ding and Sherry Glied, *Tightening the Rules Around Short-Term Health Insurance Plans Won't Lead to More People Going Without Insurance* (Oct. 5, 2023), https://www.commonwealthfund.org/blog/2023/tightening-rules-around-short-term-health-insurance-plans-wont-lead-more-people-going.

[46] Staff on H. Comm. On Energy & Commerce, 116th Cong., Shortchanged: How the Trump Administration's Expansion of Junk Short-Term Health Insurance Plans is Putting American at Risk at 20 (Comm. Print June 2020); *see also* 2024 Rule, 89 Fed. Reg. at 23392 (April 4, 2024).

[47] Karen Pollitz et al., *Understanding Short-Term Limited Duration Health Insurance*, KFF (Apr. 23, 2018), https://www.kff.org/affordable-care-act/issue-brief/understanding-short-term-limited-duration-health-insurance/.

apply.[48]   This can often lead to the denial of coverage, exclusion of coverage for pre-existing conditions, or charging of higher premiums for consumers who have a pre-existing condition. If a consumer is diagnosed with a condition while enrolled in the plan, the STLDI plan insurer may investigate and deny coverage if it determines that the consumer had sought care or treatment for the condition prior to obtaining coverage under the plan.[49]

Second, these plans are not required to cover EHBs, including maternity care, prescription drugs, mental health care, preventative care, and other benefits deemed essential under the ACA. For example, a study that analyzed twenty-four STLDI plans throughout forty-five states and the District of Columbia found that forty-three percent of plans did not cover mental health services, sixty-two percent did not cover substance abuse treatment, seventy-one percent did not cover outpatient prescription drugs, and none of the plans covered maternity care.[50]   Oftentimes, STLDI insurers will hide these limitations in fine print.  For example, a plan may claim to cover hospital care but then, in fine print, exclude coverage for "treatment of injury resulting from participation in organized sports."[51]

Third, these plans can impose lifetime and annual limits on the amount of benefits paid out, and they are not subject to the annual cost-sharing limits under the ACA.  For example, some

---

[48] Medical Underwriting, HealthCare.Gov, https://www.healthcare.gov/glossary/medicalunderwriting/#:~:text=A%20process%20used%20by%20insurance,with%20what%20exclusions%20or%20limi

[49] Karen Pollitz et al., *Understanding Short-Term Limited Duration Health Insurance*, KFF (Apr. 23, 2018) https://www.kff.org/affordable-care-act/issue-brief/understanding-short-term-limited-duration-health-insurance/.

[50] *Analysis Most Short-Term Health Plans Don't Cover Drug Treatment or Prescription Drugs, and None Cover Maternity Care*, KFF (Apr. 23, 2018), https://www.kff.org/affordable-care-act/press-release/analysis-most-short-term-health-plans-dont-cover-drug-treatment-or-prescription-drugs-and-none-cover-maternity-care/.

[51] Report on Testing Consumer Understanding of a Short-Term Health Insurance Plan, Nat'l Ass'n of Ins. Comm'rs 1, 2 (Mar. 15, 2019), https://healthyfuturega.org/wp-content/uploads/2019/04/Consumer-Testing-Report_NAIC-Consumer-Reps.pdf.

of these plans may require cost sharing in excess of $20,000, whereas the ACA limits cost sharing for Marketplace plans at $9,200 in 2024.[52]

Further, many individuals face unexpected health care needs and are not able to anticipate the costs of treating such unexpected, serious illnesses when choosing an insurance plan. Many serious health conditions onset in early adulthood and impact otherwise healthy individuals. For example, onset of multiple sclerosis can occur at any age, with most people with MS diagnosed between age twenty and fifty.[53] About ninety percent of ALS cases occur without any known family history or genetic cause, and diagnosis can occur when people are in their twenties and thirties.[54] Additionally, forty-one percent of pregnancies in the United States are unplanned.[55]

In addition to limiting or excluding coverage for such conditions outright, STLDI plans may deny coverage for emergent health issues by claiming such conditions were "pre-existing." This is, unfortunately, the exact experience that Sam Bloechel, an LLS advocate, suffered.[56] After experiencing back pain that would not improve, he spoke to an insurance agent about upgrading his health insurance to cover potential future healthcare needs. He told the agent that he had previously visited a chiropractor for his back issues and the agent assured Sam that as long as he had not received a diagnosis, the plan that she recommended would provide him with sufficient

---

[52] Karen Pollitz et al., *Understanding Short-Term Limited Duration Health Insurance*, KFF (Apr. 23, 2018) https://www.kff.org/affordable-care-act/issue-brief/understanding-short-term-limited-duration-health-insurance/; *Explaining Health Care Reform: Questions About Health Insurance Subsidies*, KFF (Oct. 25, 2024), https://www.kff.org/affordable-care-act/issue-brief/explaining-health-care-reform-questions-about-health-insurance-subsidies/.

[53] *About MS*, National Multiple Sclerosis Society, https://www.nationalmssociety.org/understanding-ms/what-is-ms/who-gets-ms.

[54] *Understanding ALS*, ALS Association, https://www.als.org/understanding-als#:~:text=Most%20people%20who%20develop%20ALS,common%20in%20men%20than%20women.

[55] *Updated Methodology to Estimate Overall and Unintended Pregnancy Rates in the United States*, National Center for Health Statistics (Apr. 2023), https://www.cdc.gov/nchs/data/series/sr_02/sr02-201.pdf.

[56] *Under-covered, how "Insurance Like" Products Are Leaving Patients Exposed*, LLS (Mar. 2021), https://www.lls.org/sites/default/files/National/undercovered_report.pdf.

coverage. The agent promised Sam that buying anything more comprehensive would have been a waste of money. The agent failed to disclose that Sam actually purchased a STLDI plan that would not cover any condition that the plan deemed to be pre-existing. Sam's back pain turned out to be non-Hodgkin lymphoma, and his STLDI plan denied coverage for the treatment, leaving Sam with the bill for his cancer treatment. The total cost of Sam's medical treatment was over $800,000. If the agent had instead led Sam to an individual plan with ACA protections that provided comprehensive benefits, it is likely that this entire ordeal could have been avoided.

### C.    Consumers Confused STLDI Plans With Plans That Offer Comprehensive Coverage.

As the Departments have now realized—and as many Amici warned at the time of its enactment—the longer-duration definition of STLDI in the 2018 Rule allowed these plans to be easily confused with comprehensive insurance.  Evidence suggests that sales and marketing practices that promote STLDI plans as a substitute for comprehensive coverage compound consumer confusion. *See* 2024 Rule, 89 Fed. Reg. at 23365-23366 (April 3, 2024).  Numerous studies demonstrate that consumers who look for coverage may not understand all of the details of a plan's coverage and can be persuaded to select a STLDI plan through deceptive and misleading marketing by insurance brokers.[57]

---

[57] *See Private Health Coverage: Results of Covert Testing for Selected Offerings*, GAO (Aug. 24, 2020), https://www.gao.gov/products/gao-20-634r (finding that in eight out of thirty-one cases health insurance sales representatives engaged in potentially deceptive practices).

Among the abusive practices documented in recent studies,[58] researchers have found that

- sales representatives frequently fail to mention to consumers that there is a no-cost, no-deductible marketplace plan available, even for consumers the representative knows to be eligible for such plans;

- brokers made false or misleading statements that hid the restrictions of the limited benefits plans;

- representatives use aggressive sales tactics, such as pressuring consumers to commit to a plan over the phone or suggesting that the plans would become unavailable or more expensive if they took the time to look at other options or to try and budget the plans;

- marketing materials for STLDI plans provide incomplete and often misleading information about plans' limitations and exclusions;

- marketers leverage consumers' trust in and familiarity with ACA products to sell inadequate STLDI policies in their stead by mimicking the gold, silver, and bronze metal value levels used to label ACA-compliant plans sold on ACA Marketplaces; and

- STLDI products are more actively marketed as a substitute for ACA coverage during open enrollment periods.

---

[58] Rachel Schwab and JoAnn Volk, *The Perfect Storm: Misleading Marketing of Limited Benefit Products Continues as Millions Losing Medicaid Search for New Coverage*, T University McCourt School of Public Policy (Aug. 2023) at 5, https://georgetown.app.box.com/v/the-perfect-storm-august-2023. *See also Private Health Coverage: Results of Convert Testing for Selected Offering*s. Government Accountability Office (August 2020), https://www.gao.gov/products/gao-20-634r; Staff on H. Comm. On Energy & Commerce, 116th Cong., Shortchanged: How the Trump Administration's Expansion of Junk Short-Term Health Insurance Plans is Putting American at Risk at 20 (Comm. Print June 2020); *Unscrupulous and Partnership to Protect Coverage, Under Covered: How "Insurance-Like" Products are Leaving Patients Exposed*, https://www.lls.org/sites/default/files/National/undercovered_report.pdf.; Corlette, S., Lucia, K., Palanker, D., and Hoppe, O., *The Marketing of Short-Term Health Plans: An Assessment of Industry Practices and State Regulatory Responses*, Urban Institute (2019), https://www.urban.org/sites/default/files/publication/99708/moni_stldi_final_0.pdf.; Findlay, S. S. Corlette et al., *The Marketing of Shot-Term Health Plans*, Robert Wood Johnson Foundation (Jan. 31, 2019), https://www.rwjf.org/en/insights/our-research/2019/01/the-marketing-of-short-term-health-plans.html.

Indeed, following the 2018 Rule change, many individuals switched from plans with ACA protections to STLDI plans due to the aggressive and misleading marketing tactics that insurers employed.  In 2018, a survey of insurance brokers and agents found that healthy, higher-income consumers were being pushed out of the individual health insurance market and non-compliant ACA plans offered brokers higher commissions and marketing support compared to ACA-compliant plans.  One insurance broker noted that the non-compliant plans were "very aggressive … and the commissions are higher."[59]  Consumers often have an incomplete understanding of the complex and ever-evolving health insurance market and lack sufficient information to make an informed decision regarding their health insurance coverage.  As Amici explained in their comments on the proposed rule, many consumers may purchase these STLDI plans without realizing they do not cover benefits they will need, such as preventive services, maternity care, or new cancer care.[60]

**D.    Inappropriate Use of STLDI Plans as Long-Term Coverage Creates Market Instability and Increases Costs for All Consumers.**

The damage caused by STLDI plans is not limited to the individual enrollees of such plans and their families, who are faced with medical debt as a result of their lack of coverage. The proliferation and misuse of these plans creates market instability in the individual plan marketplace and makes healthcare more expensive for everyone. The 2018 Rule changing the definition of STLDI plan, and the subsequent proliferation of these plans, have led to higher premiums in the individual market. 2024 Final rule, 89 Fed. Reg. at 23351 ("This has resulted  in increased premiums for individuals seeking to purchase individual health insurance coverage").  As

---

[59] Kevin Lucia et al., *Views From the Market: Insurance Brokers' Perspective on Changes to Individual Health Insurance*, Robert Wood Johnson Foundation (Aug. 2018), https://www.rwjf.org/en/insights/our-research/2018/08/views-from-the-market.html.

[60] *See, e.g.*, Leukemia & Lymphoma Society, Comment Letter on Short-Term, Limited-Duration Insurance Proposed Rule (Sep. 11, 2023), https://www.regulations.gov/comment/CMS-2023-0116-13372.

previously noted, the sponsors of STLDI plans medically underwrite and reject individuals who are likelier to have higher medical costs such as individuals with pre-existing conditions or woman who are pregnant. Instead, these plans selectively cover individuals who are likelier to have lower healthcare costs. This cherry-picking leaves the sicker and therefore most costly individuals who are in most need of comprehensive coverage in the individual market. Because health care for these individuals is more costly, premiums consequently increase for all individuals who participate in the individual market.  A 2020 analysis of rate filings found that premiums for individual plans in states that did not limit or restrict short-term limited-durations plans were five percent greater relative to states that restricted the availability of the plans.[61]  This is not surprising – it was anticipated. Commenters predicted and the Departments acknowledged in the 2018 Rule that the proliferation of STLDI policies could contribute to higher premiums in the individual market. 2018 Rule, 83 Fed. Reg. 38212.

**IV.    The 2024 Rule Strikes the Appropriate Balance between STLDI Plans and ACA-Compliant Comprehensive Plans, Preserves the Intended Purposes of These Different Types of Plans, and Addresses Potential Abuses**

**A.    The 2024 Rule Appropriately Defines STLDI Plans so They Are Short-Term.**

The 2024 Rule appropriately revises the definition of "short-term, limited duration insurance" to better reflect the intended purpose and limited scope of such short-term, transitional plans. *See* 26 C.F.R. § 54.9801-2, 29 C.F.R. § 2590.701-2, 45 C.F.R. §144.103.  Indeed, as the name suggests, this limited type of health insurance is intended to be *temporary* and "typically fills temporary gaps in coverage that may occur when an individual is transitioning from one plan or

---

[61] Dane Hansen and Gabriella Dieguez, *The impact on short-term limited-duration policy expansion on patients and the ACA individual market* (Feb. 2020),  https://www.milliman.com/en/insight/the-impact-of-short-term-limited-duration-policy-expansion-on-patients-and-the-aca-individual-market.

coverage to another, such as transitioning between health coverage offered by one employer to health coverage offered by another employer." 2024 Rule, 89 Fed. Reg. at 23340.

Thus, the 2024 Rule amends the STLDI definition to reflect common-sense parameters similar to the 2016 definition and ensures such plans remain temporary. This addresses the issue that emerged after the 2018 Rule, described in Section III, where STLDI plans supplanted ACA-compliant policies to the detriment of individuals seeking comprehensive coverage. By establishing an initial term of up to three months for STLDI policies, with a maximum four-month duration, the 2024 Rule better aligns the definition with the plain terms of the ACA and ensures that the regulations more clearly describe transitional insurance policies designed to bridge short-term coverage gaps and provide limited benefits. ACA-compliant plans have contract terms of twelve months and offer comprehensive coverage, without imposing any lifetime or annual limits on coverage of "essential health benefits," and are prohibited from engaging in various forms of discrimination. 42 U.S.C. § 300gg-1(a). Given that STLDI plans generally are exempt from the Federal individual market consumer protections and requirements for comprehensive coverage, it is critical that consumers be able to easily distinguish between the two.

**B.** **Under the 2024 Rule, STLDI Plans Remain Available to Consumers in Appropriate Circumstances and Will Not Drive Lapses in Coverage.**

While the 2024 Rule appropriately defines short-term STLDI plans such that they are, in fact, short-term, it will not functionally eliminate or render them useless as an insurance option. Instead, STLDI plans will remain temporary and of short duration, as intended. Moreover, as discussed in Section III, STLDI coverage is generally only available to consumers who can pass medical underwriting. This aspect of STLDI plans is not disturbed by the challenged rule – they will remain viable options just as they were under the similar 2016 regulatory definition. Nothing

in the challenged rule suggests that individuals who do not want an ACA-compliant plan or cannot afford one cannot seek coverage from an STLDI plan.

Nor will the 2024 Rule drive lapses in coverage. Such concerns[62] are overstated, as STLDI plans will remain available options for consumers to select to cover gaps in comprehensive coverage. Significantly, consumers will still be able to purchase subsequent STLDI policies from unaffiliated issuers within a twelve-month period (*i.e.*, the challenged rule only prohibits "stacking" of multiple STLDI policies together to extend the period of coverage *by the same issuer*). *See* 2024 Rule, 89 Fed. Reg. at 23361-23362; 45 C.F.R. § 144.103 ("a renewal or extension includes the term of a new short-term, limited-duration insurance policy, certificate, or contract of insurance issued by the same issuer…"). So, the 2024 Rule does not prohibit a *consumer* from re-enrolling in STLDI coverage with a different issuer every 4 months. But, it will prevent an *issuer* from repeatedly extending and renewing enrollment in an STLDI policy to extend the duration in a way that inappropriately attempts to mimic a comprehensive coverage plan to the confusion of consumers.

Therefore, the 2024 Rule strikes an appropriate balance of STLDI plans and ACA-compliant plans that are available for consumers to select, according to their needs, while properly distinguishing between the two. STLDI plans will remain short-term, temporary policies that serve as a bridge between comprehensive health insurance policies are preserved, without the risk that consumers may mistakenly believe that STLDI policies are equivalent alternatives to ACA plans.

---

[62] Pl. Compl. Para 4. ("The New Rule, discussed in earnest herein, renders STLDI plans a Hobson's choice because the arbitrarily short duration of STLDI's under the new rule would expose the consumer to lapses in coverage. By rendering STLDI's useless, Defendants are ostensibly eliminating the public's personal choices for various types of insurance products because Defendants believe they know what is best.")

**C.    The 2024 Rule Appropriately Requires Notice to Consumers That Will Help Them Make Informed Choices.**

The 2024 Rule also encourages (but does not compel) enrollment in comprehensive coverage by lowering the risk that STLDI plans are inappropriately marketed as a substitute for comprehensive coverage or used in a way to circumvent ACA or other Federal consumer protections.  As detailed in Section III, many STLDI plan issuers engage in marketing techniques that are confusing and, at times, deceptive by suggesting these plans are substitutes for comprehensive health insurance or concealing plan limitations and exclusions.  Limiting the duration of STLDI plans fosters better consumer understanding of plan differences and awareness of coverage options by distinguishing between them to better inform consumers of insurance choices and scope.

The 2024 Rule also promotes more informed consumer decision-making by requiring greater transparency to consumers by STLDI plan issuers.  Specifically, the rule amends the STLDI notice requirements to further clarify the differences between STLDI and comprehensive coverage, as well as ensure that the notice is prominent and easy to read and understand.  *See* 2024 Rule, 89 Fed. Reg. 23338, 26 C.F.R. § 54.9801-2, 29 C.F.R. § 2590.701-2, 45 C.F.R. § 144.103.  Amici agree with the Departments that the STLDI notice requires issuers to disclose the key differences between STLDI and ACA-compliant plans before the sale or renewal is complete,[63]  and is important to help consumers understand the limitations of STLDI and distinguish such plans from comprehensive coverage. Short-Term, Limited-Duration Insurance, Proposed Rule, 88 Fed. Reg. 44596 at 44614 (July 12, 2023).  The final changes to the notice, which were informed by plain language experts, consumer testing, and comments from consumer advocates, State regulators, and

---

[63] 2024 Rule, 89 Fed. Reg. at 23368-23374.

26

other interested parties, also address concerns about low health literacy, while keeping the notice a reasonable length and directing consumers to other accessible information (*e.g.*, HealthCare.gov). 2024 Rule, 89 Fed. Reg. at 23368-23374.  Thus, the notice provides consumers with "concise, accurate information to evaluate insurance products so that consumers can make informed decisions about health coverage."  2024 Rule, 89 Fed. Reg. at 23368.  By finalizing such changes to the notice provision in tandem with the revised definition of STLDI plans, it will further protect consumers from the deceptive marketing practices reported and observed. *Id.*

The 2024 Rule facilitates appropriate enrollment in ACA plans through reduced confusion about STLDI versus ACA-compliant plans, bolstered by increased affordability of comprehensive coverage in the individual marketplaces due in part to expanded premium tax credit subsidies. Under the 2024 Rule, the appropriate type of affordable coverage will be realized, not circumvented or diverted – while preserving the availability of STLDI, when appropriate.

**D.     The 2024 Rule Preserves the Stability of the ACA Marketplace.**

The 2024 Rule also preserves the stability of markets for ACA-compliant plans, to the benefit of those who purchase them.  As described in Section III, the proliferation of non-ACA compliant plans has had the cumulative result of weakening the overall effectiveness of the ACA for two reasons. Expansion of limited-coverage STLDI products negatively impacts individuals who rely on comprehensive coverage by siphoning younger and healthier individuals away from the ACA-compliant market risk pool, thereby segmenting the individual market risk pool and needlessly inflating premiums.[64]   The 2024 Rule will decrease premiums, allowing for more Americans to obtain affordable and comprehensive health insurance.

---

[64] Dane Hansen & Gabriella Dieguez, *The impact of short-term limited-duration policy expansion on patients and the ACA individual market: An analysis of the STLD policy expansion and other regulatory actions on patient spending, premiums, and enrollment in the ACA individual marke*t Milliman Actuarial (Feb. 2020), https://www.milliman.com/-

## CONCLUSION

For the foregoing reasons, Amici respectfully submit that the court should deny plaintiffs'

motion for summary judgment and grant defendants' motion for summary judgment.


Respectfully submitted,


/s/ Katherine G. Treistman
KATHERINE G. TREISTMAN
katherine.treistman@arnoldporter.com
State Bar No. 00796632
ARNOLD & PORTER KAYE SCHOLER LLP
700 Louisiana Street, Suite 4000
Houston, Texas 77002
Tel.: (713) 576–2400
Fax: (713) 576–2499

CATHERINE BRANDON, *Pro Hac Vice Pending*
catherine.brandon@arnodlporter.com
(D.C. BAR #: 988411)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001-3743
Tel.: (202) 942-6611
Fax: (202) 942-5999

MONIQUE NOLAN, *Pro Hac Vice Pending*
Monique.Nolan@arnoldporter.com
(D.C. BAR #: 483383)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001-3743
Tel.: (202) 942-5048
Fax: (202) 942-5999

ALYSSA LATTNER, *Pro Hac Vice Pending*
Alyssa.Lattner@arnoldporter.com
(D.C. BAR #: 1737187)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.

---

/media/milliman/pdfs/articles/stld-impact-report_20200219.ashx?la=en&hash=
EE2BA0088DA4B0B5D404E6C1946115FC

Washington, D.C. 20001-3743
Tel.: (202) 942-5282
Fax: (202) 942-5999

BRIAN DUNPHY, *Pro Hac Vice Pending*
Brian.Dunphy@arnoldporter.com
(MA BAR #: 67902)
ARNOLD & PORTER KAYE SCHOLER LLP
200 Clarendon Street, 53rd Floor
Boston, MA 02116
Tel.: (617) 226-9195
Fax: (627) 226-9199

LORELI WRIGHT, *Pro Hac Vice Pending*
Loreli.Wright@arnoldporter.com
(CO Bar #:51320)
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
Tel.: (303) 863-2353
Fax: (303) 863-23-01

## APPENDIX: LIST OF AMICI CURIAE

1. The Leukemia & Lymphoma Society (LLS)
2. The AIDS Institute
3. ALS Association
4. Arthritis Foundation
5. Cancer Support Community
6. Cancer*Care*
7. Crohn's & Colitis Foundation
8. Cystic Fibrosis Foundation (CFF)
9. Epilepsy Foundation of America
10. Families USA
11. Muscular Dystrophy Association (MDA)
12. National Alliance on Mental Illness (NAMI)
13. National Multiple Sclerosis Society (NMSS)
14. National Patient Advocate Foundation
15. National Organization for Rare Disorders (NORD)

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2024, I filed this Motion with the United States District Court for the Eastern District of Texas using the CM/ECF system, which will cause it to be served on all counsel of record.

Dated: December 18, 2024                    Respectfully submitted,


                                            */s/ Katherine G. Treistman*
                                            KATHERINE G. TREISTMAN